# PRODUCT TRANSFER AGREEMENT

This Agreement is entered into this 13th day of December, 2001 by and between Blue Ridge Pharmaceuticals, Inc., a Delaware corporation ("BRP") and Virbac Corporation, a Delaware corporation ("VBAC").

WHEREAS, BRP and VBAC are parties to a Development and Distribution Agreement dated as of December 22, 1999 relating to the development and registration by BRP of certain products intended for the treatment and prevention of heartworms and other conditions in dogs and the manufacturing and marketing of such products by VBAC (the "Development Agreement");

WHEREAS, the parties desire to terminate the Development Agreement, BRP desires to transfer all of its interest in the products covered by the Development Agreement to VBAC, and VBAC desires to acquire such interest, all on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, the parties agree as follows:

1. <u>Definitions</u>. As used herein, the following terms shall have the following meanings:

"<u>ANADA</u>" means abbreviated new animal drug application.

"<u>INAD</u>" means investigational new animal drug notice.

"<u>FDA/CVM</u>" means the U.S. Food and Drug Administration Center for Veterinary Medicine.

"<u>Affiliate</u>" means, with respect to a party, a person or entity that controls, is controlled by or is under common control with, such party.

"<u>Products</u>" means the 1G Product, 2G Product, 3G product and Flavored Pyrantel Product.

"<u>1G Product</u>" means a liver-flavored Ivermectin-based drug for prevention of heartworms in dogs only, as further and more specifically described in that certain ANADA No. 200-270 approved by FDA/CVM on November 30, 2001.

"<u>2G Product</u>" means a liver-flavored Ivermectin and Pyrantel Pamoate-based product for prevention of heartworms and treatment of hookworms and roundworms in dogs only, as further and more specifically described in that certain ANADA No. 200-302 filed with FDA/CVM, the ANADA for which was approved by FDA/CVM on May 30, 2001.

"3G Product" means a liver-flavored Ivermectin, Pyrantel Pamoate, and Praziquantel-based product for prevention of heartworms and treatment of hookworms, roundworms and tapeworms in dogs only, as further and more specifically described in that certain INAD No. 10-404 filed with and currently pending before FDA/CVM.

"Flavored Pyrantel Product" means a liver-flavored Pyrantel Pamoate product for use in treatment of roundworms and hookworms in dogs only, as further and more specifically described in that certain ANADA No. 200-281 approved by FDA/CVM on January 3, 2001.

"Pyrantel Combination Product" means any product, other than the 2G Product and the 3G Product, developed by or on behalf of VBAC (1) containing Pyrantel Pamoate in combination with one or more other active ingredients and (2) the Registration of which is dependent upon ANADA No. 200-281.

"Registrations" means the registrations of the Products with FDA/CVM or any registrations, licenses or approvals of any Regulatory Agency in any country or territory outside the United States performing a function comparable to FDA/CVM, in each case required to market and sell the Products in such country or territory. The Registrations are each individually referred to as a Registration.

"Know-How" means all technical information, data, studies, formulae, processes and other proprietary information of BRP now existing relating to the Products including all formulation, manufacturing, scientific or clinical data cited, referenced or contained in any application for any Registration applied for by BRP.

"Territory" means the world with respect to the 1G Product, 2G Product, Flavored Pyrantel Product and Pyrantel Combination Product; the United States and Canada with respect to the 3G Product.

"Term" means, with respect to each Product, the period of time beginning on the date of Registration of such Product and ending 15 years after such date.

"Net Sales" means the net revenue of VBAC and its Affiliates and sublicensees from sales of Products to unaffiliated third parties in the Territory, after deducting returns, discounts and price reductions actually taken and reasonable free goods.

"Ethical Market" means the market for products sold pursuant to prescriptions by or through veterinarians.

"Pet Specialty Channel" means retail outlets that offer primarily pet and companion animal products, including, but not limited to, independent pet stores and pet superstores.

"Farm and Fleet Sector" means retail outlets that offer a range of livestock and animal products beyond pet products, including rural/urban feed dealers and organizations such as Southern States Cooperative and Tractor Supply Company.

"OTC Channel" means the Pet Specialty Channel and retail stores that offer a variety of products, such as Wal-Mart, K-Mart and Costco.

"Patent Claim" shall have the meaning ascribed to such term in Section 7.

"New Product" shall have the meaning ascribed to such term in Section 9.

2. Sale of Assets. Subject to the terms and conditions of this Agreement, BRP hereby sells, assigns and transfers to VBAC, free and clear of any and all liens and encumbrances, all of BRP's worldwide rights, title and interest in and to the Products, including all of BRP's Know-How, goodwill, Registrations, ANADAs, NADA's and INADs relating to the Products and the Iverhart.com URL, and in and to the trademark IVERHART (the "Trademark"), including United States trademark application (Serial No. 75/321,729). Following the date hereof BRP shall have no further obligations with respect to the development, registration, manufacture or sale of Products except as specifically provided in this Agreement.

3. Payments. In consideration of the assets transferred pursuant to Section 2, VBAC shall make the following payments to BRP throughout the Term:

(a) royalties of 1% of Net Sales of the 1G Product;

(b) royalties of 2% of Net Sales of the 2G Product;

(c) royalties of 2% of Net Sales of the 3G Product;

(d) royalties of 2% of Net Sales of any Pyrantel Combination Product sold in the Ethical Market; and

(e) royalties of 4% of Net Sales of any Pyrantel Combination Product sold in the OTC Channel.

Notwithstanding the foregoing provisions of this Section 3, (i) the royalties specified in clause (b) shall initially be reduced by 50% until such time as the royalties payable pursuant to clause (b) equal $199,750 and (ii) the royalties specified in clauses (a) and (b) shall be reduced by 50% upon FDA/CVM approval and commercial availability of the 3G Product, and the royalties specified in clause (c) shall be reduced by 30% at such time as there are two generic competitors of the 3G Product in the United States, each of which are sold under separate ANADAs.

4. <u>License</u>.

(a) VBAC hereby grants to BRP, and BRP hereby accepts, a royalty-free right and license to continue to distribute, sell and have sold the Flavored Pyrantel Product in any market other than the Ethical Market. Such license shall be non-exclusive in the Farm and Fleet Sector and Pet Specialty Channel and shall be otherwise exclusive. VBAC shall provide BRP and BRP's licensees with access to such information and data relating to the Flavored Pyrantel Product as BRP or such licensees shall reasonably require to distribute and sell the Flavored Product as described in the preceding sentence.

(b) BRP shall advise VBAC in a timely manner of any information of which it or its licensees have knowledge concerning any adverse experience in connection with the use of the Flavored Pyrantel Product, including the incidence or severity thereof, associated with non-clinical or clinical use, studies, investigations or tests, whether or not determined to be attributable to such product. Reports of serious adverse experiences shall be made available to VBAC within five (5) working days after BRP or any of its licensees becomes aware of any such adverse experience. Upon receipt of any such information concerning any serious adverse experience by VBAC, the parties shall promptly consult each other and use commercially reasonable efforts to agree upon appropriate actions. VBAC shall make such reports of adverse experiences as shall be required by FDA/CVM.

5. <u>Duties of VBAC</u>.

(a) <u>Development and Registration</u>. VBAC shall use commercially reasonable efforts to complete the development and registration of the 3G Product in the United States. VBAC shall keep BRP reasonably informed as to the status of such registration.

(b) <u>Sales</u>. VBAC undertakes to use commercially reasonable efforts to create a market for, promote, supply the demand for and obtain maximum sales of the Products in each country within the Territory in which a commercially viable market exists. Such efforts shall include advertising, exhibitions, distribution of samples and technical sales materials, and demonstrations.

(c) <u>Reports and Payments</u>. VBAC shall deliver to BRP within 45 days after the end of each calendar quarter a written report showing its computation of Net Sales for such quarter and royalties due under Section 3 for such calendar quarter. Simultaneously with the delivery of each such report, VBAC shall tender payment of all amounts shown to be due thereon. All amounts due under this Agreement shall be paid to BRP in United States dollars by check, or in such other form and/or manner as BRP may reasonably request. During the term of this Agreement, BRP shall have the right from time to time (not to exceed twice during each calendar year) to inspect, or have an agent, accountant or other representative inspect, during normal business hours, and upon reasonable advance notice (not less than one week), such books, records and other supporting data of VBAC as may be necessary to verify VBAC's computation of royalties due under this Agreement. In the event that an examination by BRP of VBAC's books and records

reveals an underpayment by VBAC, VBAC shall immediately pay BRP the deficiency plus interest at an annual rate equal to the Prime Rate (as reported in The Wall Street Journal on the date payment was due) plus 2%. In the event such examination reveals an overpayment by VBAC, BRP shall immediately pay VBAC the amount of such overpayment plus interest from the date of overpayment at an annual rate equal to the Prime Rate plus 2%. In the event that any underpayment amounts to more than 5% of the amount due for the period examined, VBAC shall also reimburse BRP for the cost and expense of the examination.

6. <u>Representations and Warranties</u>.

(a) <u>By BRP</u>. BRP hereby represents and warrants to VBAC that:

(i) BRP is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware;

(ii) BRP has all necessary corporate power and authority to enter into this Agreement, grant to VBAC all of the rights granted hereby and to perform its obligations hereunder;

(iii) this Agreement is the valid, legal and binding obligation of BRP, enforceable against it in accordance with its terms, except where enforceability may be limited by bankruptcy, insolvency or similar laws affecting creditors' rights or by principles of equity;

(iv) the execution, delivery and performance by BRP of this Agreement do not conflict with or result in a breach of, any agreement, written or oral, to which it is a party or by which it or its property is bound;

(v) BRP has good and marketable title to the Know-How, the Registrations, the Trademark and the ANADAs and INADs relating to the Products, free and clear of all claims, security interests, liens, and encumbrances, and has granted no license to manufacture, market, sell or distribute any of the Products other than the license granted by the Development Agreement;

(vi) BRP has no knowledge of any agreement that will restrict in any manner VBAC's right to manufacture, have manufactured, market, sell and distribute the Products throughout the world or to purchase any of the active ingredients of the Products or that will require payment by VBAC with respect thereto to any person other than pursuant to this Agreement;

(vii) BRP has delivered to VBAC or will deliver to VBAC within 30 days after the date hereof all data relating to the Products, in all forms maintained by BRP, within its possession, custody and control and will retain no copies thereof except for a single copy of data submitted by BRP to FDA/CVM, which BRP will utilize solely for the purpose of responding to any inquiry by FDA/CVM;

(viii) to the best of its knowledge, BRP has not disclosed any proprietary information relating to the Products, including the Know-How and the contents of any applications for Registrations, to any person or entity other than FDA/CVM, VBAC and BRP's employees and contractors directly involved with BRP's development of the Products who are bound by written agreements to protect the confidentiality of such information; and

(ix) BRP has consulted with patent counsel regarding the freedom from infringement of the formulations of each of the Products and, to the best of BRP's knowledge, such formulations do not infringe any valid U. S. patent.

(b) By VBAC. VBAC hereby represents and warrants that:

(i) VBAC is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware;

(ii) VBAC has all necessary corporate power and authority to enter into this Agreement, and perform its obligations hereunder;

(iii) this Agreement is the valid, legal and binding obligation of VBAC, enforceable against it in accordance with its terms, except where enforceability may be limited by bankruptcy, insolvency or similar laws affecting creditors' rights or by principles of equity; and

(iv) the execution, delivery and performance by VBAC of this Agreement do not conflict with, or result in a breach of any agreement, written or oral, to which it is a party or by which it or its properties is bound.

7. Indemnification.

(a) By VBAC. VBAC shall defend and indemnify BRP from and against all damages, liabilities, costs and expenses (including reasonable legal fees and costs) arising out of:

(i) any breach of this Agreement by VBAC;

(ii) any negligent act or omission by it or its subcontractors, subdistributors, agents, sublicensees or Affiliates or any willful misconduct by it or its subcontractors, subdistributors, agents, sublicensees or Affiliates; or

(iii) subject to Section 7(d) below, any claim relating to the manufacture, marketing, use or sale of Products, including any claim that any Product infringes a patent, copyright or trade secret of a third-party, and any claim for injuries or death to persons or animals or damage to or destruction of tangible property;

6

provided, however, that VBAC shall have no liability or obligation hereunder with respect to any claim to the extent such claim results from any breach of this Agreement by BRP or its Affiliates, any negligent act or omission or any willful misconduct of BRP or its Affiliates, or any claim that the formulation of a Product infringes any patent or constitutes misappropriation of any trade secret or proprietary information of any third party.

(b) <u>By BRP</u>. BRP shall defend and indemnify VBAC from and against all damages, liabilities, costs and expenses (including reasonable legal fees and costs) arising out of any claim resulting from:

(i) any breach of this Agreement by BRP;

(ii) any negligent act or omission by BRP or its Affiliates or any willful misconduct by BRP or its Affiliates; or

(iii) subject to Section 7(d) below, any claim that the formulation of a Product infringes any patent or constitutes misappropriation of any trade secret or proprietary information of any third party;

provided, however, that BRP shall have no liability or obligation hereunder with respect to any claim to the extent such claim results from any breach of this Agreement by VBAC or any negligent act or omission or any willful misconduct by VBAC or its subcontractors, subdistributors, agents, sublicensees or Affiliates.

(c) <u>Party Seeking Indemnification</u>. If either party seeks defense or indemnification under the terms of this Section 7, it shall inform the other party of the claim as soon as reasonably practicable after it receives notice thereof, shall permit the other party, at that party's cost, to assume direction and control of the defense of the claim, and shall cooperate as requested (at the expense of the other party), in the defense of the claim. The defending or indemnifying party shall not settle or otherwise compromise any claim or suit without the prior written consent of the indemnified party.

(d)    <u>Limitations on Patent Indemnity</u>.

(i) Upon assertion of a claim in writing by any third party to BRP or VBAC, prior to six months following the first commercial sale of a Product, that the formulation of such Product infringes any patent right of any third party (a "Patent Claim"), the party to which such assertion is made shall notify the other party within two business days. Within five business days following such notice, BRP and VBAC shall engage mutually acceptable patent counsel, who shall not be regular patent counsel to either party or its Affiliates. Such counsel shall be asked to advise whether such counsel believes that (A) the formulation of the relevant Product more likely than not infringes the relevant claim(s) of the relevant patent(s), either literally or under the Doctrine of Equivalents, (B) whether the relevant claim(s) of the relevant patent(s) are more likely than not to be valid, and (C) if such counsel believes that the relevant Product more likely than not infringes

7

the relevant claims(s) of the relevant patent(s), either literally or under the Doctrine of Equivalents and if the formulation of the relevant Product has changed since the date of this Agreement, whether such counsel believes that the formulation of the Product as of the date hereof would have more likely than not infringed the relevant claim(s) of the relevant patent(s), either literally or under the Doctrine of Equivalents. BRP shall bear all costs of such counsel. It is understood for purposes of this Section 7(d) that the formulation of a Product will not be deemed to have changed solely due to an increase in the amount of active ingredient (i.e. ivermectin, praziquantel or pyrantel pamoate) made to compensate for losses during the manufacturing process.

(ii) If the advice of such counsel is that the Product is more likely than not to infringe one or more claim(s) of the relevant patent(s), either literally or under the Doctrine of Equivalents and that such advice does not result from any change in the formulation of the Product following the date hereof, and that such claim(s) are more likely than not to be valid, then either,

(A) VBAC may elect, upon notice given to BRP within five business days following receipt of such advice, to discontinue making, marketing and selling the Product, in which event BRP shall pay VBAC (1) $500,000 if the Patent Claim relates to the 1G Product, $500,000 if the Patent Claim relates to the 3G Product, and $750,000 if the Patent Claim relates to the 2G Product and (2) $234,375 (62.5% of the milestone payments paid by Virbac under the Development Agreement with respect to the 2G Product) if the Patent Claim relates to the 2G Product and $437,500 (62.5% of the milestone payments paid by Virbac under the Development Agreement with respect to the 3G Product)if the Patent Claim relates to the 3G Product; and BRP shall defend VBAC with respect to such Patent Claim but shall have no obligation to indemnify VBAC for any damages, liabilities, costs or expenses arising out of such Patent Claim; or

(B) VBAC may continue making, marketing and/or selling the Product, in which event BRP shall have no further obligation to defend or indemnify VBAC with respect to such Patent Claim and VBAC shall defend and indemnify BRP with respect to such Patent Claim pursuant to Section 7(a)(iii); or

(C) Notwithstanding any notice by VBAC to BRP under Section 7(d)(ii)(A) above, BRP may direct VBAC, within five business days after receipt of such notice, to continue making, marketing and/or selling the Product, in which case BRP shall defend and indemnify VBAC with respect to such Patent Claim pursuant to Section 7(b)(iii) hereof.

(iii) If the advice of such counsel is that either (A) the Product is less likely than not to infringe, either literally or under the Doctrine of Equivalents, at least one of the relevant claim(s) of the relevant patent(s) or (B) each of the relevant claim(s) of the relevant patent(s) is less likely than not to be valid, then VBAC shall proceed with the marketing and sale of the Product hereunder, VBAC shall have no obligation to defend or indemnify BRP with respect to such Patent Claim and BRP shall defend VBAC with

8

respect to such Patent Claim but shall have no obligation to indemnify VBAC for any damages, liabilities, costs or expenses arising out of such Patent Claim.

(iv) BRP shall have no obligation to defend or indemnify VBAC under Section 7(b)(iii) with respect to any patent infringement claim relating to a Product that is asserted more than six months following the first commercial sale of such Product.

(v) If the formulation of the Product has changed since the date hereof and if the advice of such counsel is that the formulation of the Product as of the date hereof would not more likely than not infringe the relevant claim(s) of the relevant patent(s), either literally or under the Doctrine of Equivalents, then BRP shall have no obligation to defend or indemnify VBAC under Section 7(b)(iii) with respect to such Patent Claim.

8. Proprietary Information. BRP shall not disclose to any person other than VBAC any proprietary or confidential information relating to the Products, including the Know-How and the contents of any applications for Registrations, except to the extent required by law. In the event that BRP shall become obligated to disclose any such proprietary or confidential information under operation of law, BRP shall promptly notify VBAC and will cooperate with VBAC, at VBAC's expense, to obtain a protective order or otherwise minimize the scope of the disclosure.

9. Competitive Products. During the Term, neither BRP nor its Affiliates shall, directly or indirectly, develop, manufacture, market or sell, or assist any third party in developing, manufacturing, marketing or selling, any product having substantially the same formulation as a Product or any Pyrantel Combination Product (a "Competitive Product"). Notwithstanding the foregoing, BRP shall not be deemed to have breached this Section 9 solely as a result of (i) the acquisition of BRP or an Affiliate of BRP by an entity that is developing, manufacturing, marketing or selling a Competitive Product, (ii) the acquisition by BRP or an Affiliate of BRP of a business that is at the time of such acquisition developing, manufacturing, marketing or selling a Competitive Product, or (iii) the continued development, manufacturing or selling by such acquiring entity, BRP or such Affiliate, as the case may be, of such Competitive Product following such acquisition; provided, however, that so long as such Competitive Product is being sold in the Territory, VBAC shall be relieved of its obligation under Section 3 to pay royalties with respect to such Product or Pyrantel Combination Product with which such Competitive Product competes.

10. Development Agreement. The Development Agreement is hereby terminated. Neither party shall have any continuing right against or obligation to the other under the Development Agreement, and each party releases and discharges the other from any and all claims and liability arising thereunder or with respect to the transactions contemplated thereby, including, without limitation, any claims described in the letter dated August 13, 2001 from Michael Joseph to Conan Deady or any claims with respect to the invoice in the amount of $199,750.22 dated November 6, 2001 issued by VBAC to BRP.

11. <u>Cooperation</u>. BRP agrees to cooperate with VBAC to the extent reasonably necessary to enable VBAC to assume complete responsibility for prosecuting all pending NADAs, ANADAs and INADs relating to the Products, including providing prompt notification to FDA/CVM to transfer sponsorship of all such pending NADAs, ANADAs and INADs to VBAC.

12. <u>Governing Law; Jurisdiction</u>. This Agreement shall be governed by and construed under the laws of Delaware, as if made and to be fully performed in such jurisdiction. All issues and questions concerning the construction, validity, enforcement, and interpretation of this Agreement shall be governed by and construed in accordance with the laws of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of Delaware, or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than Delaware.

13. <u>General Provisions</u>.

(a) <u>Assignment</u>. Neither this Agreement nor any of the rights or obligations hereunder may be assigned by either party hereto without the prior written consent of the other party and any attempt to do so will be void. Notwithstanding the foregoing, either party may assign any of its rights or obligations to any Affiliate of such party, provided that the assigning party shall continue to be primarily liable for all of its obligations hereunder.

(b) <u>Notices</u>. All notices, requests and other communications made hereunder shall be in writing and shall be deemed duly given upon receipt if delivered personally, sent by registered or certified mail, return receipt requested postage prepaid, sent via nationally recognized overnight carrier or sent via facsimile (upon confirmation of delivery thereof), as follows, or to such other address or person as either party may designate by notice to the other party hereunder.

If to VBAC:

Virbac Corporation
3200 Meacham Boulevard
Fort Worth, Texas 76137
Facimile No: (817) 831-8362
Attn: Chief Executive Officer

If to BRP:

Blue Ridge Pharmaceuticals, Inc.
4249 Piedmont Parkway, Ste. 105
Greensboro, NC 27410
Facsimile No.: (336) 852-3540
Attn: Chief Executive Officer

With copy to:

IDEXX Laboratories, Inc.
One IDEXX Drive
Westbrook, ME 04092
Facsimile No: (207) 856-0347
Attn: General Counsel

(c) <u>Successors and Assigns</u>. This Agreement shall be binding and inure to the benefit of the parties hereto and their permitted successors and assigns. No other person shall be entitled to rely upon this Agreement or be entitled to any benefits hereunder except as expressly provided for herein.

(d) <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

BLUE RIDGE PHARMACEUTICALS, INC.

By: _____
Name: Erwin F. Workman, Jr., Ph.D.
Title: President

VIRBAC CORPORATION

By: _____
Name: Thomas L. Bell
Title: President

The undersigned corporation unconditionally
Guarantees the performance by BRP of its
Obligations under this Agreement.

IDEXX Laboratories, Inc.

By: _____
Erwin F. Workman, Jr., Ph.D.
Executive Vice-President

11