# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE HARTZ MOUNTAIN CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>CHANELLE PHARMACEUTICALS MANUFACTURING LIMITED,<br><br>Defendant. | Civil Action No. 2:05-cv-02488-WJM-RJH<br><br>**CERTIFICATION OF<br>ALBERT AHN** |

I, Albert Ahn, of full age, certify as follows:

1. I am a Corporate Vice President and the Chief Scientific Officer for plaintiff The Hartz Mountain Corporation ("Hartz"). As Hartz's Chief Scientific Officer, I had overall project responsibility with respect to the veterinary medicine products that defendant Chanelle Pharmaceuticals Manufacturing Limited ("Chanelle") was to supply to Hartz pursuant to a Confidential License and Supply Agreement, dated January 10, 2003 (the "Alliance Agreement"). As such, I have personal knowledge of, and am fully familiar with, the facts set forth below with respect to Chanelle's contacts with New Jersey.

**Hartz's New Jersey-Headquartered Business**

2. Hartz is a manufacturer and distributor of pet products, including veterinary medicines. The company's headquarters and principal place of business are in Secaucus, New Jersey. Hartz's products are sold throughout the United States, including in New Jersey. All activities of Hartz employees described herein, except as otherwise noted, occurred in New Jersey.

### Exploratory Discussions To Sell Veterinary Medicines In New Jersey

3.  Hartz and Chanelle first engaged in preliminary discussions about possible business opportunities in or around January 2002. At that time, Chanelle's managing director, Dr. Michael Burke, represented to me that Chanelle had developed certain veterinary medicine products. He also inquired about Hartz's interest in a business alliance with Chanelle to bring these products to the United States market. Chanelle is based in Ireland and sells most of its products in Europe.

4.  Hartz was particularly interested in a Chanelle product that Dr. Burke called "Dronhart" (later changed to "All-Heart"), which combined three different drugs – Ivermectin, Praziquantel and Pyrantel – in one tablet, because Dronhart could potentially address a wide variety of pet parasites, including hookworm, tapeworm, roundworm, and heartworm, in a single medication. At the time, no company had developed a commercial product in the United States that combined all three drugs because of certain technical challenges associated with the combination, which Dr. Burke represented to me Chanelle had solved.

5.  To facilitate the exchange of confidential information, the parties entered into a Confidentiality Agreement, dated January 30, 2002, a copy of which is attached as Exhibit A. This agreement enabled Chanelle to provide Hartz with certain confidential information relating to its products that Hartz needed to evaluate the merits of a possible business relationship with Chanelle.

6.  Over the course of the next several months, I continued to have ongoing conversations with Dr. Burke about a business alliance between Hartz and Chanelle to sell veterinary medicine products. At some point these discussions expanded to also

2

include the possibility of the parties jointly developing certain flea and tick products that Hartz would manufacture in New Jersey and supply to Chanelle for sales outside the United States.

7. In addition to oral conversations, the parties exchanged between New Jersey and Ireland confidential technical information relating to the proposed products to be developed under the contemplated business alliance.

8. On or about April 23, 2002, I met with Dr. Burke in Ireland to discuss the proposed business alliance. He provided me with various literature showing that Chanelle had developed 53 veterinary products and had over 600 registrations (*i.e.*, governmental approvals to market products in a particular country) for such products in over 70 countries, including the United States. A copy of the literature page that I received from Dr. Burke containing this information is attached as Exhibit B. In addition, Dr. Burke provided me with a product listing (a copy of which is attached as Exhibit C) showing that Chanelle had made Dronhart tablets comprised of Ivermectin, Pyrantel and Praziquantel available for sale.

**Hartz Prepares a Draft Alliance Agreement and Business Plan**

9. As of October 2002, sufficient information had been exchanged between the parties to permit Hartz's project team in New Jersey to draft an agreement to govern the Hartz-Chanelle alliance. Based on input from me and others, Hartz's general counsel, Max C. Marx, prepared a draft of the Alliance Agreement, which was titled "Confidential License and Supply Agreement." The draft was provided to Dr. Burke for his review.

10. At or around the same time that the draft Alliance Agreement was prepared, the Hartz project team developed a business plan for the alliance. The business

plan was prepared in anticipation of a New Jersey visit by Dr. Burke to discuss the business alliance and to negotiate the final agreement. Chief Executive Officer Robert Devine and I prepared the business plan with input from the Hartz marketing department. A copy of the business plan including my hand-written notes from the meeting with Dr. Burke is attached as Exhibit D.

**Business Plan Projects $4.5 Million in New Jersey Sales**

11. The business plan was based on the anticipated synergies of combining Hartz's expertise in marketing animal health products in the United States with the expertise that Chanelle represented it possessed with respect to developing and manufacturing certain veterinary products. The five-year business plan projected worldwide sales from the business alliance of $184 million, with U.S. sales of $154 million. Of the $154 million in sales, the business plan projected $107 million of sales for the Dronhart product.

12. Hartz's sales distribution network covers the entire United States. Accordingly, based on Hartz historical data, product sales per state tend to roughly approximate the percentage of the population in a particular state. Since the 2004 population census figures show that New Jersey has about 3% of the U.S. population, $154 million in United States sales would translate to over $4.5 million in New Jersey sales.

**Dr. Burke Comes to New Jersey in November 2002 to Review
Business Plan and Negotiate Agreement for Business Alliance**

13. I have reviewed Dr. Burke's July 22, 2005 Declaration, in which he states that Mr. Devine and I met with him *in Ireland* on November 1, 2002 to negotiate the business alliance. This statement, however, is incorrect, as Dr. Burke came to New

4

Jersey on November 1, 2002 and met in Hartz's offices with me, Mr. Devine, and Alan Kezner and Bruce Truman of the Hartz marketing department. The New Jersey location of this meeting is indisputably established by the following documents:

- An October 8, 2002 e-mail from Mr. Devine to Dr. Burke "confirm[ing] our meeting of Friday, November 1, in our Secaucus offices in New Jersey (copy attached as Exhibit E);

- An October 18, 2002 e-mail from Dr. Burke to Mr. Devine confirming Dr. Burke's hotel reservation at the New York Palace, thanking Mr. Devine for arranging for a car service, and again referencing the November 1 meeting (copy attached as Exhibit F);

- An October 21, 2002 e-mail from Mr. Devine to Dr. Burke titled "Car Service – New York to Secaucus – 11/1/02," advising Dr. Burke that a limousine would pick him up at 8:15 a.m. on November 1 and take him to Secaucus (copy attached as Exhibit G);

- My hand-written notes from the November 1, 2002 meeting, titled "Meeting (Secaucus) November 1, 2002" and listing Dr. Burke, Mr. Devine, Mr. Kezner, Mr. Truman and me as attendees (copy attached as Exhibit H); and

- A November 6, 2002 e-mail from Dr. Burke to Mr. Devine and me thanking us for our hospitality during the meeting at Hartz's headquarters the past Friday (copy attached as Exhibit I).

14. At the November 1 meeting in Secaucus, we presented Dr. Burke with Hartz's business plan for the Hartz-Chanelle alliance. In addition, we discussed and negotiated the terms for the business alliance that we had set forth in the initial draft of the Alliance Agreement referenced in paragraph 9 above.

**Final Version of the Alliance Agreement**
**Is Prepared and Signed by Hartz in New Jersey**

15. Based on comments from the November 1 meeting in New Jersey, Mr. Marx prepared a revised draft of the Alliance Agreement. He continued to revise the

5

draft based on comments from the parties until they agreed on the final version of the document, which is dated January 10, 2003.

16. After Mr. Marx prepared the final version of the Alliance Agreement, Mr. Devine signed the agreement in New Jersey on behalf of Hartz on or about January 10, 2003. Mr. Marx then forwarded the partially executed Alliance Agreement to Dr. Burke in Ireland, who signed it on behalf of Chanelle or about January 16, 2003, and then returned it to Hartz in New Jersey. A copy of Dr. Burke's January 16, 2003 cover letter enclosing the fully executed Alliance Agreement is attached as Exhibit J.

**Alliance Agreement Imposes U.S. and New Jersey Obligations**

17. Since the Alliance Agreement was focused on U.S. sales, it required Chanelle to file U.S. registrations for each of the identified products covered by the Agreement, and contemplated that such products would ultimately be approved for sale in the U.S. by the U.S. Food and Drug Administration Center for Veterinary Medicine ('FDA/CVM"). In addition, Chanelle agreed that all products would be manufactured according to commercial Good Manufacturing Practices, as required by the applicable FDA regulations.

18. Although the Alliance Agreement contemplated that the drug tablets would be formulated in Ireland, Hartz was responsible for designing the packaging, which Chanelle knew Hartz would undertake in New Jersey. In addition, Hartz was to pay for the packaging, which it would likely have purchased from New Jersey sources.

**Project Meetings and Information
Exchanged Between New Jersey and Ireland**

19. The parties had exchanged certain technical material of a very general nature before entering into the Alliance Agreement. However, a great deal of work

remained to be done to produce veterinary medicine products that could receive FDA/CVM approval and could thus be marketed and sold in the U.S.

20. Specifically, the parties needed to create a structure by which their respective employees could work together to get the products ready for market. Thus, at my suggestion, we implemented weekly telephone conferences to address technical, financial, logistical, and other issues associated with moving the process forward. Minutes were regularly taken of these calls and distributed among the participants. Samples are attached as Exhibit K with the substance redacted on confidentiality grounds.

21. The parties exchanged numerous important documents between New Jersey and Ireland during this aspect of the alliance, including without limitation, product specifications, manufacturing details, testing data, and manufacturing work orders (which Chanelle prepared and sent to Hartz outlining the specific work that it proposed to perform, and which Hartz would review and approve as appropriate).

**Dr. Burke Comes to New Jersey for Additional Alliance Meetings**

22. Additional work on the project also took place during face-to-face meetings between the parties. For example, Dr. Burke himself returned to New Jersey for such meetings with Hartz on or about May 21, 2003 and March 9, 2004, respectively.

23. The May 21, 2003 meeting was a general status meeting for the project, during which the parties discussed the timeline for manufacture and FDA inspection and product stability issues.

24. On March 9, 2004, when Dr. Burke came to New Jersey for the third time, the project was seriously floundering. Notwithstanding Dr. Burke's representations to

the contrary regarding Dronhart, the testing data that Chanelle had provided to Hartz failed to show that it had developed a commercially viable product. During the course of the March 9, 2004 meeting Dr. Burke advised us that Chanelle could develop a commercially viable product by using a different technology, but that Hartz would need to invest over $3 million more in connection with implementing changes to Chanelle's existing facility to allow for product development.

25. Because we were extremely concerned at this point whether Chanelle would ever be able to deliver on Dr. Burke's ambitious representations, we proposed undertaking some of the manufacturing at our facility in New Jersey. Dr. Burke promised to consider such an arrangement. A copy of a March 21, 2004 project plan that Hartz prepared and sent to Chanelle discussing the respective advantages and disadvantages of manufacturing in New Jersey instead of Ireland is attached as Exhibit L with the substance redacted on confidentiality grounds.

**Chanelle Sends Invoices To New Jersey For Payment**

26. As other issues arose with respect to the project, Hartz on several occasions agreed to assume the costs of certain project-related items, for which Chanelle would seek payment by sending invoices to New Jersey (examples of which are attached as Exhibit M).

**Location of Final Manufacture Deferred Pending Proof Of Commercial Viability**

27. Ultimately, Hartz decided not to fund Chanelle's request to upgrade its facilities to develop the products, nor to expend additional funds preparing Hartz's New Jersey facilities for such manufacturing operations, until Chanelle could provide Hartz with sufficient data that the products could obtain FDA/CVM approval. After several

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
ALBERT AHN

Dated: August 29, 2005