## CONFIDENTIAL LICENSE AND SUPPLY AGREEMENT

This Confidential License and Supply Agreement made as of this 10th day of January, 2003, by and between Chanelle Pharmaceuticals Manufacturing Ltd., an Irish corporation having its principal place of business at Athenry Road, Loughrea, County Galway, Ireland ("CHANELLE"), and The Hartz Mountain Corporation, a New Jersey corporation having its principal place of business at 400 Plaza Drive, Secaucus, New Jersey 07094-3699 ("Hartz").

### RECITALS

A.  The parties have developed various products described in Schedule 1 attached hereto (a "Product" or the "Products") and to be more particularly described in Abbreviated New Animal Drug Application ("ANADA") to be approved by the U.S. Food and Drug Administration Center for Veterinary Medicine ("FDA/CVM") for each of the Products (the "U.S. Registration").

B.  Hartz wishes to obtain both exclusive and non-exclusive rights to purchase the Products from CHANELLE in the Territory and to market and sell the Product in the Territory, and CHANELLE is willing to sell the Product and grant such rights to Hartz, on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, the parties agree as follows:

1.  Definitions. As used herein, the following terms shall have the following meanings:

1.1  "Affiliate" means, with respect to a party, a person or entity that controls, is controlled by or is under common control with, such party.

1.2  "Agreement Year" means each twelve (12) calendar month period beginning from the First Commercial Date of each Product for that particular Product.

1.3  "Annual CPI Adjustment" means the annual CPI change to the price of Product whereby the price for Product may be adjusted upward or downward effective [January] 1 or the first day of the month after the end of each Contract Year (the "Adjustment Date") based on the CPI; accordingly, for purposes of this definition, the CPI which was published and in effect on January 1, 2003 shall constitute the "Beginning CPI"; if the CPI most recently published and in effect on the Adjustment Date (the "Extension CPI") has increased or decreased over the Beginning CPI, the price for Product for the next Contract Year shall be adjusted upward or downward by multiplying the price for Product in effect just prior to the Adjustment Date (the first of which shall occur on January 1, 2004) by a fraction, the numerator of which is the Extension CPI and the denominator of which is the Beginning CPI; for each adjustment in each succeeding Contract Year, the Beginning CPI becomes the prior Extension CPI after each adjustment to the price of Product; further provided all amounts less than a full cent shall be discarded and ignored; and, by way of example, if on January 1, 2003, the Beginning CPI is 100 and if on March 1, 2004, the Extension CPI is 103 and if the price for Product in effect on February 28, 2004 is US$1.20 per package, the new price for Product shall be US$1.23 per package (or 103/100 times US$1.20 per package = US$1.236 or $1.23 per package (after ignoring the amount less than a cent)), which represents a 3% increase to go into effect on March 1, 2004 and to apply for the remainder of that Contract Year, and the Beginning CPI for the subsequent Contract Year shall be 103.

1



1.4   "Brand Leader Products" means, for the United States comparable products manufactured by Merial, Bayer, Novartis, Virbac and/or Fort Dodge and, in a particular country and for a particular Product, the leading product or products in such country in terms of gross sales and gross profits.

1.5   "cGMP" means current Good Manufacturing Practices or other relevant standards promulgated, required or endorsed by the U.S. Food and Drug Administration and other relevant licensing or registering agency similar to the FDA, including the Veterinary Medicines Directorate, the Irish Medicines Board, L'Agence Nationale du Medicament Veterinaire (of France) and other agencies related to the Products throughout the Territory.

1.6   "Confidential Information" shall have the meaning set forth in Section 15 hereof.

1.7   "CPI" means the European Harmonized Indices of Consumer Prices—All Items 1982-1984 – Base for the applicable twelve (12) month period as published by Eurostat, provided, however, if the CPI is changed so that the base year differs from that used for the Beginning CPI, the CPI shall be converted in accordance with the conversion factor published by Eurostat and further provided that if the CPI is discontinued or revised during the term of this Agreement, such other government index or computation with which it is replaced shall be used in order to obtain substantially the same result as would be obtained if the CPI had not been discontinued or revised, provided that if the CPI is discontinued then the parties agree that it shall be replaced by the U.S. Consumer Price Index for all Urban Consumers, U.S. City Average, All Items 1982-1984 = 100 Base.

1.8   "CPI Notice" shall have the meaning set forth in Section 9.2 hereof.

1.9   "Deadline for U.S. Registration" shall mean the deadlines for initial U.S. Registrations set forth in Schedule 3 hereof.

1.10   "Exclusive Chanelle Channels of Trade" shall mean the veterinary channels of trade in the European Union.

1.11   "Exclusive Hartz Channels of Trade" means all over the counter and veterinary channels of trade in the Exclusive Hartz Territory including without limitation the mass merchandiser stores (including without limitation Wal-Mart, K-Mart, Target and others), grocery stores (including without limitation Winn Dixie, Publix, Kroger and others), drugstores, pet specialty, independent pet products stores, veterinary channels of trade, e-commerce, catalogue sales and other channels of trade.

1.12   "Exclusive Chanelle Territory" means the European Union for the veterinary channels of trade and South Africa for all channels of trade.

1.13   "European Union" means the countries of the European Union from time to time, including without limitation those countries as of the date of this Agreement (a) Belgium (b) Denmark, (c) Germany, (d) Greece, (e) Spain, (f) France, (g) Ireland, (h) Italy, (i) Luxembourg, (j) the Netherlands, (k) Austria, (l) Portugal, (m) Finland, (n) Sweden and (o) the United Kingdom, in addition to any future successor or candidate countries from time to time that join the European Union, provided that no country shall be deleted from this definition of European Union even if such country leaves the European Union .

1.14   "Exclusive Hartz Territory" means the United States of America and Canada.



1.15    "FDA/CVM" has the meaning ascribed to such term in the Recitals.

1.16    "FDC Act" means the U.S. Food, Drug and Cosmetic Act, as amended, and the regulations promulgated thereunder.

1.17    "First Commercial Date" means six months after the approval of the relevant Registration and after the first sale of the Product.

1.18    "Force Majeure Event" shall mean, in relation to either party, any circumstances beyond the reasonable control of that party including, without limitation, acts of God, any act, regulation or law of any government, war, civil commotion, destruction of production facilities or materials by fire, earthquake or storm, labor disturbance, epidemic, or failure of suppliers, public utilities, or common carriers.

1.19    "Hartz Flea & Tick Products" shall mean the full line of Hartz flea and tick products sold by Hartz in the United States as of the date of this Agreement.

1.20    "Joint Territory" shall mean the entire world including without limitation the over the counter channels in the European Union but excluding the Exclusive Hartz Territory and the Exclusive Chanelle Territory, excluding South Africa and excluding the Time Restricted Product.

1.21    "Jointly Developed Products" shall have the meaning set forth in Section 2.4 hereof.

1.22    "Net Final Price" shall have the meaning set forth in Section 9.1 hereof.

1.23    "New Product" shall have the meaning set forth in Section 2.3 hereof.

1.24"   Joint Channels of Trade" means (a) all over the counter or non-veterinary channels of trade in the European Union and (b) all over the counter and veterinary channels of trade in the Joint Territory.

1.25    "Over-The-Counter Channels of Trade" means all over the counter or non-veterinary channels of trade (even if the veterinarian is located within an over-the-counter store or outlet) including without limitation the mass merchandiser stores (including without limitation ASDA, Wal-Mart, K-Mart, Target and others), grocery stores (including without limitation Ahold, Carrefour, Winn Dixie, Publix, Kroger and others), drugstores, pet specialty, independent pet products stores, e-commerce, catalogue sales and other similar channels of trade.

1.26    "Packaged Complete Price" means either the Initial Allheart Packaged Complete Price and/or the Initial Generics Packaged Complete Price, depending on the meaning and context.

1.27    "Pending Patent Issues" shall have the meaning set forth in Schedule 4 hereof.

1.28    "Prices" means any of the prices for the Products set forth in Section 9 hereof, including without limitation the Packaged Complete Price or the Net Final Price, as the context may require..

1.29    "Product" or "Products" has the meaning ascribed to such term in the Recitals and in Schedule 1.

1.30    "Registrations" shall mean the U.S. Registration and all other similar registrations for the Products throughout the Territory.



1.31    "Regulatory Agencies" shall have the meaning ascribed in Section 6.1 hereof.

1.32    "R&D Costs" shall mean the total research and development budgets of costs for each of the Products.

1.33    "Registrations Costs" shall mean the total registration costs for each of the Products.

1.34    "Specifications" shall mean the specifications for the Product set forth in Schedule 1 hereto.

1.35    "U.S. Registration" has the meaning ascribed to such term in the Recitals.

1.36    "Term" has the meaning ascribed to such term in Section 4.2.

1.37    "Territory" means the world.

1.38    "Time Restricted Product" shall mean Prazitel and Zantel in the European Union and shall further mean Prazitel in Eastern Europe and South Africa arising from the Pending Patent Issues in effect until December 31, 2008.

1.39    "Veterinary Channels of Trade" shall mean all veterinary or veterinarian prescription based channels of trade whereby a veterinarian clinic is involved.

2. Sale and Purchase.

2.1 Rights to Sell: On and subject to the terms and conditions of this Agreement, CHANELLE hereby grants to Hartz, and Hartz hereby accepts, the (a) exclusive rights to market, sell and have sold the Products in the Exclusive Hartz Channels of Trade in the Exclusive Hartz Territory and (b) the non-exclusive rights to market, sell and have sold the Products in the Joint Channels of Trade. The parties further agree that (a) CHANELLE shall have the exclusive rights to market, sell and have sold the Products in the Exclusive Chanelle Channels of Trade in the European Union and (b) the non-exclusive rights to market, sell and have sold the Products in the Joint Channels of Trade in the Territory.

2.2 Agreement to Manufacture and Sell: On and subject to the terms of this Agreement, CHANELLE agrees to manufacture, package and sell to Hartz the Products pursuant to the Specifications and the other terms and conditions set forth herein, including without limitation cGMP and other requirements of any of the Regulatory Agencies and the Registrations.

2.3 New Products: As part of the parties' mutual cooperation, either party may (but shall not be obligated to) disclose to the other party new product developments or new technological breakthroughs (collectively, the "New Products") that could be beneficial to the other party. It is agreed and understood that neither party is precluded from developing any such New Products for itself or for another company and/or is not precluded from dealing with products or technology for a third party.

2.4 Jointly Developed Products: Chanelle agrees to work with Hartz jointly to develop new products from time to time and the parties shall enter into a separate agreement reflecting the mutually agreed terms and conditions relating to such Jointly Developed Products.

4



2.5 <u>Additional Active Ingredients</u>: At any time, Hartz may propose to add active ingredients to the Products (the "Additional Active Ingredients"). Upon such proposal, Hartz and Chanelle shall work and cooperate together to develop such Product with different Additional Active Ingredients.

2.6 <u>Exclusivity</u>: Chanelle agrees to exclusively sell and supply to Hartz the Products during the Term and represents, warrants and covenants that there are no other grants of rights to sell, distribute, or purchase in the Territory as of the date of this Agreement and during the Term, except as permitted or contemplated herein from the date of this Agreement.

3. <u>Costs Sharing</u>

3.1 <u>Registrations Costs</u>: Chanelle agrees to provide any and all access to all tests and the drug master file conducted or held by Chanelle or its contractors for Hartz to be able to obtain Registrations in the Territory. In consideration for the rights granted by CHANELLE to Hartz under Section 2 and provided this Agreement shall remain in effect at the time of the scheduled Registration Costs and shall not otherwise have been defaulted by Chanelle, Hartz agrees to be responsible and pay for all Registration Costs (including all animal studies) incurred by Hartz for the Products to be sold by Hartz in the Exclusive Hartz Channels of Trade in the Exclusive Hartz Territory. The parties further agree that CHANELLE shall be liable for all of the Registration Costs for the Products to be sold by CHANELLE in the Exclusive Chanelle Channels of Trade in the European Union. Additionally, the parties agree that the responsibility for the Registrations Costs for the Products in the Joint Territory shall be apportioned as follows: (a) where Hartz does not intend to sell the Products but CHANELLE intends to sell the Products in a particular country in the Joint Territory, CHANELLE shall be responsible and pay for the Registration Costs, (b) where CHANELLE does not intend to sell the Products but Hartz intends to sell the Products in a particular country in the Joint Territory, Hartz shall be responsible and pay for the Registration Costs in such country in the Joint Territory or (c) where both CHANELLE and Hartz intend to sell the Products in a particular country in the Joint Territory, both parties shall be responsible and pay for the Registration Costs on a 50/50 basis. Notwithstanding clauses (a) and (b) above, if either Hartz or CHANELLE, as the case may be, later elects to sell the Products in such country in the Joint Territory, Hartz or CHANELLE, respectively, shall reimburse the other party 50% of the Registration Costs in such country in the Joint Territory.

3.2 <u>Research and Development Costs</u>: Chanelle shall be solely responsible and pay for all R&D Costs for the Products in the Territory.

3.3 <u>Ownership of Registrations</u>: The parties mutually agree that all Registrations shall be jointly owned by the parties, subject to applicable laws and regulations which prohibit co-ownership.

4. <u>Term</u>

4.1 <u>Initial Term</u>: This Agreement shall commence on the date hereof and remain in effect until five (5) years from the initial First Commercial Date, unless sooner terminated in accordance with the terms of this Agreement (the "<u>Initial Term</u>").

4.2 <u>Renewal Term</u>: Upon the expiration of the Initial Term, this Agreement shall be automatically renewed for up to two (2) successive five (5)-year periods (each such period, a "<u>Renewal Term</u>") unless either party shall have provided written notice to the other party of its intent not to renew this Agreement at least 90 days before the expiration of the Initial Term or any Renewal Term. The Initial Term and any Renewal Terms are referred to collectively in this Agreement as the "<u>Term</u>".



5. Duties of Hartz.

5.1 Marketing of Products: Hartz undertakes to use commercially reasonable efforts to create a market for, promote, supply the demand for and obtain maximum sales of the Products throughout all areas of the Territory. Such efforts shall include, but not be limited to, advertising, exhibitions, distribution of samples and technical sales materials, and demonstrations.

5.2 Promotions: Hartz shall, at its own cost and expense, produce all promotional literature, advertisements and other promotional materials to be used in connection with the marketing and sale of the Products and will promptly supply copies of such materials to CHANELLE. Hartz shall also, at its own expense, develop and bear the cost of all packaged good artwork, packaging, labeling, and other associated costs.

5.3 Distributors: Hartz may appoint agents or subdistributors to sell Products throughout the Territory. Any agreement between Hartz and an agent or subdistributor shall be consistent with the terms of this Agreement and shall not serve to reduce the obligations of Hartz to CHANELLE hereunder. Hartz shall be responsible for enforcing the provision of its agreements with agents or subdistributors and shall indemnify and hold CHANELLE harmless for any expenses, damages, costs, or losses arising out of any acts or omissions by any agents or subdistributors.

5.4 Packaging Costs: Hartz agrees to arrange for and provide packaging materials (the "Packaging Materials") and also to pay for all approved packaging costs in connection with the Products (the "Packaging Costs"). Hartz shall approve the vendors for Packaging Materials and pay any such Packaging Costs directly to such vendors, unless the parties mutually agree in writing otherwise. In order to efficiently, economically and timely carry out production of the Products using such Packaging Materials and to manage and reduce the Packaging Costs, Hartz and CHANELLE shall at all times mutually cooperate, coordinate and exchange information on the planning, forecasting and production schedules for the Products. The parties agree to keep all Packaging Materials and Packaging Costs to a minimum and as needed for the production of the Products. CHANELLE agrees to comply with all planning and forecasting related to the Packaging Materials, Packaging Costs and the production of the Products as shall be mutually agreed by the parties from time to time.

6. Regulatory Matters

6.1 Validation: Subject to this Section 6.1, CHANELLE shall use commercially reasonable efforts, at its expense to complete manufacturing process validation for the Products with FDA/CVM and all other similar agencies in the Territory (the "Regulatory Agencies") particularly cGMP status. The parties agree that Hartz may from time at Hartz' own cost retain consultants, advisors and inspectors to visit, review, copy and inspect the CHANELLE facilities and records in order to confirm validation with laws, regulations, the Regulatory Agencies and requirements of the customers of Hartz. If additional investment is required for plant and equipment to achieve cGMP validation from the FDA only, Hartz will reimburse CHANELLE for required investments either in the cost of goods until equipment is paid or an advance from Hartz which could then be used against purchases of the Products. Such investments will be subject to Hartz and Hartz' consultants prior approval.

6



6.2 **Supplemental Application**: CHANELLE shall submit a supplemental application to FDA/CVM regarding Hartz's packaging and labeling, and shall use its commercially reasonable efforts to obtain approval of such packaging and labeling.

6.3 **CHANELLE Compliance**: CHANELLE, together with any manufacturer of Products for CHANELLE, shall be responsible for compliance with all applicable FDA/CVM and other Regulatory Agencies' requirements relating to Product manufacturing compliance and quality assurance. With respect to such matters, CHANELLE shall promptly and fully respond to any communication from FDA/CVM and other Regulatory Agencies and shall file any reports required by such agency. The parties agree that Hartz may from to time retain at Hartz' own cost consultants, advisors and inspectors to visit, review, copy and inspect the CHANELLE facilities and records in order to confirm compliance with laws, regulations, the Regulatory Agencies and requirements of the customers of Hartz.

6.4 **Hartz Compliance**: Hartz shall be responsible for compliance with all applicable FDA/CVM and other Regulatory Agencies requirements relating to Product marketing, sale and distribution, packaging and labeling (after the U.S. Registration is obtained), promotional compliance and medical issues. With respect to such matters, Hartz shall promptly and fully respond to any communication from FDA/CVM and other Regulatory Agencies and shall file any reports required by such agency.

6.5 **Cooperation with the FDA and Other Regulatory Agencies**: Each party shall cooperate with the other in responding to any issue raised by FDA/CVM or other Regulatory Agencies relating to the Products.

6.6 **Adverse Experiences**: The parties shall advise each other, within five (5) business days after receipt, of any information of which they have knowledge concerning any adverse experience in connection with the use of the Products, including the incidence or severity thereof, associated with non-clinical or clinical use, studies, investigations or tests, whether or not determined to be attributable to the Product. Reports of serious adverse experiences shall be made available to the other party within five (5) working days after a party becomes aware of any such adverse experience. Upon receipt of any such information concerning any serious adverse experience by either party, the parties shall promptly consult each other and use commercially reasonable efforts to agree upon appropriate actions. CHANELLE shall make such reports of adverse experiences as shall be required by FDA/CVM and the Regulatory Agencies.

6.7 **Recalls and Market Withdrawals**: (a) Hartz shall recall or withdraw any Product which it sells under this Agreement if required by FDA/CVM or other Regulatory Agencies or if otherwise reasonably required due to adverse experiences, manufacturing problems or similar matters. Subject to Hartz' obligation to reimburse CHANELLE for reasonable expenses (provided Hartz shall have no obligation to reimburse CHANNELLE if such recall or voluntary market withdrawal arises from the fault, negligence or conduct of CHANELLE), CHANELLE shall reasonably cooperate with Hartz in connection with any recall or withdrawal. Hartz shall bear the costs and expenses of any recall of Products unless arising from CHANELLE's fault, negligence or conduct

(b) CHANELLE shall recall or withdraw any Product which it sells under this Agreement if required by FDA/CVM or other Regulatory Agencies or if otherwise reasonably required due to adverse experiences, manufacturing problems or similar matters. Subject to CHANELLE's obligation to reimburse Hartz for reasonable expenses (provided CHANELLE shall have no obligation to reimburse Hartz if such recall or voluntary market withdrawal does arise from the fault, negligence or conduct of Hartz), Hartz shall reasonably cooperate with CHANELLE in connection with any recall or withdrawal. CHANELLE shall bear the costs and expenses of any recall of Products unless arising from Hartz' fault, negligence or conduct.

