6.8 <u>Drug Master File</u>: Upon addition of any country to the Territory or in connection with the countries in the Territory, CHANELLE will provide Letters of Access to Hartz for the drug master file for the Products in the European Union. Hartz and CHANELLE shall work together to obtain letters of access for praziquantel, fenbendazole and febantel drug master files for the Exclusive Hartz Territory. For any other countries in the Territory, CHANELLE shall provide letters of access to Hartz to the drug master file for the relevant active ingredients and the Products in such countries. The parties agree that the drug master file for praziquantel will be determined only upon the parties' determination of the amount of praziquantel raw material that the parties would expect to be used for the first three Agreement Years.

6.9 <u>Deadline for U.S. Registrations</u>: The parties agree that each of the respective Products shall be registered pursuant to the Deadlines of U.S. Registrations as set forth in Schedule 3. In the event any Product is not registered with its U.S. Registration by the Deadline for U.S. Registrations for such Product, Hartz shall have the right to terminate this Agreement with respect to such Product only.

7. <u>Orders; Minimum Order Commitment.</u>

7.1 <u>Orders</u>. Hartz shall place written orders ("<u>Orders</u>") for Products under this Agreement from time to time. Orders shall specify (i) the quantity of each Product to be delivered, which shall be not less than Two Hundred Fifty Thousand (250,000) units (small or large Product format and in which "unit" shall mean the number tablets or packets) for any individual Delivery Date, (ii) one or more Product delivery dates, none of which may be earlier than ninety (90) days after the date of the Order, unless the parties agree in writing to a shorter delivery period ("<u>Delivery Date(s))</u>") and (iii) one or more Product delivery destinations. CHANELLE shall accept all Orders placed under this Agreement which are received by it during the Term, which specify a Delivery Date or Dates within the Term and which otherwise conform to the terms of this Agreement. CHANELLE shall acknowledge all Orders in writing not more than ten (10) business days after receipt thereof.

7.2 <u>Minimum Order Commitment</u>. Hartz agrees to place Orders with CHANELLE specifying Delivery dates for at least the minimum quantity of each Product specified on <u>Schedule 2</u> (the "<u>Minimum Order Commitment</u>") during each calendar year (prorated from the date of FDA/CVM's and other Regulatory Agencies' final approval of packaging and labeling for the Products.

8. <u>Forecasts</u>. Hartz shall furnish to CHANELLE (a) annual forecasts on a calendar basis and (b) not less than ninety (90) days before the commencement of each calendar quarter during the Term a rolling forecast of the quantity of each Product for which Hartz expects to submit Orders in such calendar quarter and the three succeeding calendar quarters (or for such shorter period as may remain in the Term). Each such forecast shall constitute a binding commitment to place Orders in the next calendar quarter for the quantity of Product specified in such forecast. Each such forecast after the first shall update and replace prior forecasts as to the calendar quarters covered by such prior forecasts. The parties understand that such forecasts are merely estimates with respect to quarters other than the next calendar quarter.

9.. <u>Prices</u>.

9.1 <u>Initial Prices</u>. The parties agree that the initial packaged complete price for Allheart in each country of the Territory shall be mutually agreed between the parties (provided that CHANELLE agrees to sell to Hartz Allheart so that the initial packaged complete price is at all times below the Brand Leader Product price and shall be a minimum of of fifty percent (50%) to sixty percent (60%) below the Brand Leader Product in such country of the Territory) and shall be set forth as an amendment to this Agreement for each

8



of the countries in the Territory (the "Initial Allheart Packaged Complete Prices"). The parties further agree that each of the initial packaged complete prices for Zantel, Zerofen, Cat Wormer and Prazitel, respectively, shall be mutually agreed between the parties ( provided that CHANELLE agrees to sell to Hartz each of such Products so that the initial packaged complete price is at all times below the Brand Leader Product price and shall be a minimum of fifty percent (50%) to sixty percent (60%) below the Brand Leader Product price and provided further that each such price shall be set forth as an amendment to this Agreement for each of the countries in the Territory (the "Initial Generics Packaged Complete Prices"). Notwithstanding any Packaged Complete Price mutually agreed by the parties, at the request of Hartz and in the event Hartz shall require a special discount for tender, promotional or large orders of Products from time to time, Chanelle and Hartz shall mutually discuss and agree on such discounted Packaged Complete Price pursuant to a written amendment to this Agreement. The parties agree that Hartz shall pay the difference between the Packaged Complete Price less the allocable Packaging Costs (the "Net Final Price"). Each invoice from CHANELLE shall include a breakdown of the Net Final Price, including the Packaged Complete Price and the Packaging Costs. The parties shall mutually agree at all times as to the methodology and calculation of the Packaging Costs attributed to any sale and purchase of the Products.

9.2 Price Changes. The Prices set forth in Section 9.1 shall be subject to change annually commencing from each January 1 during the Term for each such Product and each country. Thereafter, Price changes may occur no more frequently than once every twelve (12) months. In no event shall the Price of any Product be increased by more than the lesser of (i) five percent (5%), or (ii) the "CPI Increase" (as defined in below) over the Price prevailing as of the Notice Date (as defined in the following sentence). Hartz shall notify Chanelle of any CPI Increase based on the December announcement of the CPI as soon as it is reasonably available (the "CPI Notice"). The party seeking a Price change shall give the other party not less than thirty (30) days' prior written notice (the date of such notice being the "Notice Date"). For the purposes hereof, "CPI Increase" means the percentage increase, if any, in (i) the average monthly "CPI" level for the most recent 12-month period ending before the Notice Date for which data are available, over (ii) the average monthly CPI level for the 12-month period immediately preceding that described in clause (i).

9.3 Extraordinary Price Changes. The Prices in effect from time to time may be additionally changed if the following extraordinary events occur: (a) any regulatory change by the FDA/CVM or other Regulatory Agency occurs that affects the direct manufacturing costs of the Products, (b) any substantial change to the costs of materials of the Products occurs, or (c) the Brand Leading Product price increases by more than 10% or less than 10% at any time (an "Extraordinary Event"). Upon the occurrence of an Extraordinary Event, CHANELLE or Hartz shall notify Hartz in writing of the details of the Extraordinary Event and the proposed price increase arising from such Extraordinary Event. Within 30 days of receipt of such notice, Hartz or CHANELLE, as the case may be, shall either accept or counterpropose a different Price based on such Extraordinary Event. The parties shall mutually discuss and agree to any such change of Price arising from an Extraordinary Event.

9.4 Most Favored Nations Pricing. During the Term, CHANELLE agrees that it will not offer or sell any of the Products to any other person for a price and/or on terms that are more favorable than are set forth in this Agreement ("More Favorable Terms") unless such More Favorable Terms are immediately offered to Hartz. Upon such offer by CHANELLE of such More Favorable Terms, the parties shall agree that the More Favorable Terms shall immediately apply to this Agreement.

9.5. Taxes. All Prices are exclusive of all federal, state, provincial and local taxes, levies and assessments. Hartz shall be responsible for the payment of all such taxes, levies and assessments imposed

9

on Products supplied to Hartz hereunder, excluding taxes based upon CHANELLE's possession thereof before originally scheduled delivery and taxes on CHANELLE's net income from the transaction. The parties shall cooperate in obtaining in a timely manner all documentation, including without limitation exemption certificates, necessary to allow CHANELLE to refrain from collections, such as sales tax, which it would otherwise be obligated to make.

10. Terms of Payment.

10.1 Invoices. Hartz shall pay to CHANELLE the Price (or Net Final Price, as the case may be) of all Products delivered hereunder within thirty (30) days after receipt of CHANELLE's invoice therefor.

10.2 Date of Invoices. CHANELLE will issue invoices upon shipment; provided that in the event an Order specifies that delivery will be made in installments, CHANELLE shall invoice Hartz, and Hartz shall be liable for payment, only with respect to Products actually delivered in each installment.

11. Shipment and Delivery.

11.1 Delivery Location. CHANELLE shall ship Products to Hartz, and invoice Hartz at, the respective addresses indicated on the applicable Order.

11.2 Title; Risk of Loss. Title to and risk of loss for Products shall pass to Hartz upon delivery to the carrier at the point of shipment. All shipments hereunder shall be F.O.B. point of manufacture. All Products shall be deemed delivered and subject to Hartz's dominion and control when placed in the possession of the carrier, packed and ready for shipment. CHANELLE shall cooperate with Hartz in the documentation and proof of loss claims promptly presented by Hartz to the appropriate carrier and/or insurer.

11.3 Shipping Instructions and Charges. In the absence of written instructions from Hartz, CHANELLE shall ship Products in a manner consistent with CHANELLE's usual shipping practices. All packing shall be sufficient to ensure that Products are received undamaged. Costs of packing for shipments of Products made under this Agreement are included in the Prices set forth herein. CHANELLE shall add shipping charges and the cost of any insurance which Hartz may request in connection with the Products to the Price stated on invoices, and Hartz shall pay such charges at the time payment of the Price for such Products is due and payable. However, if Hartz has specified to CHANELLE a particular carrier and has provided to CHANELLE its billing account number, the carrier will invoice Hartz directly for shipping charges.

12. Representations and Warranties.

12.1 By CHANELLE. CHANELLE hereby represents and warrants to Hartz that:

    (i) it is a corporation duly organized, validly existing and in good standing under the laws of Ireland;

    (ii) it has all necessary corporate power and authority to enter into this Agreement, grant to Hartz all of the rights granted hereby and to perform its obligations hereunder;

    (iii) this Agreement is the valid, legal and binding obligation of CHANELLE, enforceable against it in accordance with its terms, except where enforceability may be limited by bankruptcy, insolvency or similar laws affecting creditors' rights or by principles of equity;



(iv) the execution, delivery and performance by it of this Agreement do not conflict with or result in a breach of, any agreement, written or oral, to which it is a party or by which it or its property is bound;

(v) it, and its manufacturers, agents and Affiliates shall comply with all laws, rules and regulations applicable to the manufacture of the Product, including, without limitation, the FDC Act and cGMP; and

(vi) all Products delivered hereunder shall be manufactured in accordance with the specifications set forth on Schedule 1, except that Hartz shall be solely responsible for compliance with FDA/CVM requirements relating to Product packaging and labeling. CHANELLE shall not be responsible under this warranty for Products found to be defective as a result of misuse, mishandling, neglect or alteration by anyone other than CHANELLE or its manufacturers, agents and Affiliates. THE PROVISIONS OF THE FOREGOING WARRANTIES ARE IN LIEU OF ANY OTHER WARRANTY, WHETHER EXPRESS OR IMPLIED, WRITTEN OR ORAL (INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE).

12.2 By Hartz. Hartz hereby represents and warrants that:

(i) it is a corporation duly organized, validly existing and in good standing under the laws of the State of New Jersey;

(ii) it has all necessary corporate power and authority to enter into this Agreement, and perform its obligations hereunder;

(iii) this Agreement is the valid, legal and binding obligation of Hartz, enforceable against it in accordance with its terms, except where enforceability may be limited by bankruptcy, insolvency or similar laws affecting creditors' rights or by principles of equity;

(iv) the execution, delivery and performance by Hartz of this Agreement do not conflict with, or result in a breach of any agreement, written or oral, to which it is a party or by which it or its properties is bound; and

(v) it, and its sublicensees, subcontractors, subdistributors, agents and Affiliates shall comply with all laws, rules and regulations applicable to the promotion, marketing, sale, distribution, packaging, labeling and use of the Product, including, without limitation, the FDC Act and cGMP.

13. Indemnification.

13.1 By Hartz. Hartz shall defend and indemnify CHANELLE from and against all damages, liabilities, costs and expenses (including reasonable legal fees and costs) arising out of:

(i) any breach of this Agreement by Hartz;

(ii) any negligent act or omission by it or its subcontractors, subdistributors, agents or Affiliates or any willful misconduct by it or its subcontractors, subdistributors, agents, sublicensees or Affiliates; or

11



(iii) any claim relating to the promotion, marketing, sales, distribution, packaging, labeling or use of Products, and any claim for injuries or death to persons or animals or damage to or destruction of tangible property.

Hartz shall have no liability or obligation hereunder with respect to any claim to the extent such claim results from any breach of this Agreement by CHANELLE or its Affiliates or any negligent act or omission or any willful misconduct of CHANELLE or its Affiliates.

13.2 By CHANELLE. CHANELLE shall defend and indemnify Hartz from and against all damages, liabilities, costs and expenses (including reasonable legal fees and costs) arising out of any claim resulting from:

(i) any breach of this Agreement by CHANELLE; or

(ii) any negligent act or omission by CHANELLE or its manufacturers, agents or Affiliates or any willful misconduct by CHANELLE or its manufacturers, agents or Affiliates.

CHANELLE shall have no liability or obligation hereunder with respect to any claim to the extent such claim results from any breach of this Agreement by Hartz or any negligent act or omission or any willful misconduct by Hartz or its subcontractors, subdistributors, agents or Affiliates.

13.3 Party Seeking Indemnification. If either party seeks indemnification under the terms of this Section 12, it shall inform the other party of the claim as soon as reasonably practicable after it receives notice thereof, shall permit the other party, at that party's cost, to assume direction and control of the defense of the claim, and shall cooperate as requested (at the expense of the other party), in the defense of the claim. The indemnifying party shall not settle or otherwise compromise any claim or suit without the prior written consent of the indemnified party.

14. Insurance. Hartz shall maintain during the Term insurance against such risks and in such amounts as is customary for companies engaged in the marketing and sale of pharmaceutical products in connection with the Products it sells under this Agreement. CHANELLE shall maintain during the Term insurance against such risks and in such amounts as is customary for companies engaged in the marketing and sale of pharmaceutical products in connection with the Products it sells under this Agreement

15. Confidential Information.

15.1 Non-Disclosure. No information disclosed by either party to the other in connection with this Agreement or any other confidential or proprietary information (collectively, the "Confidential Information") shall be disclosed to any person or entity other than the recipient party's employees and contractors directly involved with the recipient party's use of such information who are bound by written agreements to protect the confidentiality of such information. Such Confidential Information shall be used only for the purposes contemplated by this Agreement, and such information shall otherwise be protected by the recipient party from disclosure to others with the same degree of care accorded to its own proprietary information, but not less than a reasonable degree of care. Confidential Information will not be subject to this Section if it:

(i) is or becomes a matter of public knowledge without the fault of the recipient party;



(ii) was known to the recipient party before the disclosure to it by the other party, as evidenced by written records of the recipient party;

(iii) was received by the recipient party without obligation of confidentiality from a third party having the legal right to disclose it to the recipient party;

(iv) was independently developed by the recipient party, as evidenced by written records of the recipient party;

(v) is required to be disclosed under operation of law or;

(vi) was disclosed by the recipient party with the disclosing party's prior written consent.

If the recipient party is obligated to disclose Confidential Information under operation of law, then the recipient party shall promptly notify the disclosing party and will cooperate with the disclosing party to obtain a protective order or otherwise minimize the scope of the disclosure of the Confidential Information.

Notwithstanding any provision of this Agreement to the contrary, the contents of any applications for the Registration and of this Agreement and the Schedules hereto are confidential.

15.2 Termination. Upon: (i) termination of this Agreement or (ii) written request of the party properly disclosing the information under this Section 15, the recipient of such information shall promptly deliver to the other all tangible manifestations of Confidential Information of the other party in the possession or control of such party, and all copies thereof. The obligations under this Section 15 shall survive the termination of this Agreement for a period of five (5) years.

16. Trademarks and Patents. Each party shall own its own trademarks, copyrights and trade dress associated with the Products which it sells, and neither party shall acquire, nor claim any right, title or interest in or to, any trademarks of the other party by virtue of this Agreement. The parties agree that any and all patents or similar patent rights relating to the Products shall be jointly owned by the parties on a 50/50 undivided basis, and similarly the parties agree that the costs of registering would be allocated as follows: (a) Hartz will pay for the registration costs for the patents for the Products in the Hartz Exclusive Territory, (b) Chanelle will pay for the registration costs for the patents for the Products in the European Union and (c) the parties will be mutually discussed on a country by country basis for any other countries in the Territory. Costs of defending any such patents or costs of any infringement actions shall be borne by (a) Hartz in the Hartz Exclusive Territory, (b) both parties on a 50/50 basis in an individual country in the Joint Territory if both parties are selling Products in such country, (c) a particular party in a country in the Joint Territory if that party is the only party selling in that country in the Joint Territory and (c) by Chanelle in the Exclusive Chanelle Territory. Each of the parties shall keep each other fully informed with respect to any such patent infringement actions or matters.

17. Default and Termination.

17.1 Events of Default. Without prejudice to any remedy that either party may have against the other for breach or non-performance of this Agreement, either party may terminate this Agreement:



(i) for "cause", (A) if the other party shall breach any material provision of this Agreement, and such breach is not cured within thirty (30) days after notice thereof from the other party or (B) immediately if the other party shall have breached a payment provision on three or more occasions; or

(ii) in the event of (A) a dissolution, termination of existence, liquidation, insolvency or business failure of the other party, or the appointment of a custodian or receiver of any part of such party's property, if such appointment is not terminated or dismissed within thirty (30) days; (B) a composition or an assignment or trust mortgage for the benefit of creditors by the other party; or (C) the commencement with respect to the other party of any proceeding under any federal or state bankruptcy, reorganization, receivership, insolvency or other similar law affecting the rights of creditors generally, which proceeding, if initiated against such party, is not dismissed within thirty (30) days.

17.2 Effects of Termination. Upon any termination of this Agreement:

(i) each party shall immediately deliver to the other party all books, records, notes, files, data and documents containing any proprietary or Confidential Information of the other party;

(ii) neither party shall be relieved from any of its obligations incurred before the effectiveness of termination; and

(iii) the obligations of the parties under Sections 12, 13, 15, 16, 17, 18 and 19 shall survive the termination of this Agreement.

18. Governing Law. This Agreement shall be governed by and construed under the laws of Ireland, as if made and to be fully performed in such jurisdiction.

19. General and Additional Provisions.

19.1 Assignment. Neither this Agreement nor any of the rights or obligations hereunder may be assigned by either party hereto without the prior written consent of the other party and any attempt to do so will be void. For the purposes hereof, any change in ownership of any party, as a result of which those persons who control such party on the date of this Agreement no longer control such party, shall constitute an assignment by such party of this Agreement. Notwithstanding the foregoing, either party may assign any of its rights or obligations to (i) any Affiliate of such party, provided that the assigning party shall continue to be primarily liable for all of its obligations hereunder, except that Buyer may assign this Agreement or (ii) any person which acquires all or substantially all of its assets related to this Agreement whether by merger or otherwise. Any assignment in violation of this Section shall be null and void and with no effect whatsoever.

19.2 Force Majeure. If either party is prevented from performing, or is unable to perform, any of its obligations under this Agreement, other than payment obligations, due to any act of God, fire, casualty, flood, war, strike, lock out, failure of public utilities, epidemic, destruction of production facilities, insurrection, shortage of materials or products, labor, equipment, transportation or energy, or any other cause beyond the reasonable control of the party invoking this provision, and if such party shall have used its commercially reasonable efforts to avoid such occurrence and minimize its duration and has given prompt written notice to the other party, then the affected party's performance shall be excused and the time for performance shall be extended for the period of delay or inability to perform due to such occurrence.

14

