19.3  **Publicity.**  Neither party shall, without the prior written consent of the other, disclose the specific terms and conditions of this Agreement, except as may be required by applicable securities or other laws.

19.4  **Waiver.**  The waiver by either party of a breach or a default of any provision of this Agreement by the other party shall not be construed as a waiver of any succeeding breach or default of the same or any other provision, nor shall any delay or omission on the part of either party to exercise or avail itself of any right, power or privilege that it has or may have hereunder operated as a waiver of any right, power or privilege by such party.

19.5  **Relationship of Parties.**  Nothing contained in this Agreement shall be deemed to constitute either party as the agent or representative of the other party, or both parties as joint venturers or partners for any purpose.  Neither party shall be responsible for the acts or omissions of the other party, and neither party will have the authority to speak for, represent or obligate the other party in any way without prior written authority from the other party.

19.6  **Survival of Obligations.**  All obligations of either party which, by their nature, require performance after the expiration or termination of this Agreement, shall survive the expiration or termination of this Agreement and continue to be enforceable.

19.7  **Severability; No Consequential Damages.**  The parties hereto agree that the terms and provisions in this Agreement are reasonable and that the terms and provisions of this Agreement shall be enforced to the fullest extent permissible under law.  If any term or provision of this Agreement is held to be unenforceable because it is invalid or in conflict with any law of any relevant jurisdiction, then such unenforceable or invalid term or provision shall not affect the enforceability or validity of the remaining terms and provisions of this Agreement, and the parties hereto hereby agree to replace such unenforceable or invalid term or provision with an enforceable and valid arrangement which, in its economic effect, shall be as close as possible to the unenforceable or invalid term or provision.  In no event shall either party be liable to the other for any special, indirect, incidental, exemplary or consequential losses or damages arising out of this Agreement or the transactions contemplated hereby; provided, that nothing contained herein shall limit CHANELLE's or Hartz's obligation fully to indemnify the other party under Section 13 for actions brought by third parties, even if such actions include claims by third parties for special, indirect, incidental, exemplary or consequential damages.

19.8  **Notices.**  All notices, requests and other communications made hereunder shall be in writing and shall be deemed duly given upon receipt if delivered personally, sent by registered or certified mail, return receipt requested postage prepaid, sent via nationally recognized overnight carrier or sent via facsimile (upon confirmation of delivery thereof), as follows, or to such other address or person as either party may designate by notice to the other party hereunder.

      If to Hartz:

      The Hartz Mountain Corporation
      400 Plaza Drive
      Secaucus, New Jersey  07094-3699 U.S.A.
      Facsimile No.:  011 (201) 271-0134
      Attn: Robert Devine, President and Chief Executive Officer

      With copy to:

The Hartz Mountain Corporation
400 Plaza Drive
Secaucus, New Jersey  07094-3699 U.S.A.
Facsimile No.:  011 (201) 866-0720
Attn: Max C. Marx, Esq., Corporate Vice President—General Counsel and Secretary

If to CHANELLE:

Chanelle Pharmaceuticals Manufacturing Ltd.
Athenry Road
Loughrea
County Galway
Ireland
Facsimile No.:  + 353 91 847547
Attn:  Michael H. Burke, Managing Director

19.9  Compliance with Laws.  Each party to this Agreement shall comply with all applicable laws and regulations relating to the Products, their manufacture and sale, and their respective performance under this Agreement.

19.10  Entire Agreement.  This Agreement constitutes the entire agreement between the parties with reference to the subject matter hereof.  No waiver, consent, modification or change of the terms of this Agreement shall bind either party unless in writing signed by both parties by their duly authorized representatives.  There are no understandings, agreements, representations or warranties, express or implied, with respect to the subject matter hereof except as expressly set forth in this Agreement.

19.11  Headings.  The headings contained in this Agreement are for convenience of reference only and shall not be considered in interpreting or construing this Agreement.

19.12  Successors and Assigns.  This Agreement shall be binding and inure to the benefit of the parties hereto and their permitted successors and assigns.  No other person shall be entitled to rely upon this Agreement or be entitled to any benefits hereunder except as expressly provided for herein.

19.13  Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

19.14  Sale of Hartz Flea & Tick Products.  Subject to any existing agreements that Hartz may have in or affecting the European Union from time to time, Hartz agrees to supply to Chanelle and Chanelle agrees to purchase from Hartz mutually agreed Hartz Flea & Tick Products in the European Union.  In connection with any such sales of the Hartz Flea & Tick Products, the parties agree that (a) in consideration of the license of Hartz technology involved in such sales, Hartz shall have the right to sell such Hartz Flea & Tick Products exclusively in the Over-The-Counter Channels of Trade in the European Union, (b) in consideration of the license of Hartz technology involved in such sales, each of Hartz and Chanelle shall have the right to sell such Hartz Flea & Tick Products in the Veterinary Channels of Trade in the European Union, (c) the Registration Costs and the ownership of the Registrations for such Hartz Flea & Tick Products in the European Union shall be that of Hartz, (d) the prices and other terms and conditions of such sales of such Hartz Flea & Tick Products by Hartz to Chanelle shall be mutually agreed and set forth in writing between the parties as an amendment to this Agreement or other separate agreement and (e) .any future or new products in addition to the Hartz Flea & Tick Products after the date of this Agreement shall



be discussed and, if agreed, mutually agreed pursuant to an amendment to this Agreement or other separate agreement.

    IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**CHANELLE PHARMACEUTICALS MANUFACTURING LTD.**

By: _____
Michael H. Burke, Managing Director

**THE HARTZ MOUNTAIN CORPORATION**

By: _____
Robert Devine
President and Chief Executive Officer

17

## Schedule 1 – Products and Specifications

### Products – General Description:

| Product | General Description | Additional Comments |
|---|---|---|
| Allheart | Combination of ivermectin, praziquantel and pyrantel | Addresses heartworms, hookworms, roundworms and tapeworms for dogs |
| Prazitel | Combination of praziquantel, pyrantel and febantel | Addresses hookworms, roundworms, tapeworms and whipworms for dogs |
| Zantel | Combination of praziquantel and fenbendazole | Addresses hookworms, roundworms, tapeworms and whipworms for dogs and cats |
| Zerofen | Includes fenbendazole | A Addresses hookworms, roundworms, tapeworms and whipworms for dogs and cats |
| Cat Wormer | Combination of praziquantel and pyrantel | Addresses roundworms and hookworms, *tapeworms* |

### Product Specifications:

CHANELLE agrees to provide a full description of these Product Specifications for all of the above Products within 14 days of the signing of this Agreement, which Product Specifications shall be acceptable to Hartz.

Size                          Code


1.    Product Description:

2.    Label Declarations:

3.    Expiration Date:        __months from date of manufacture, based on FDA/CVM approval.

4.    Analyses:

    **Granulation**
    Analyses          Target          Limits                    Frequency     Mfr. Method



| **Finished Product** | | | | |
|---|---|---|---|---|
| <u>Analyses</u> | <u>Target</u> | <u>Limits</u> | <u>Frequency</u> | <u>Mfr. Method</u> |

5. <u>Quarantine Requirements</u>:

6. <u>Definition of Lot</u>:

7. <u>Packaging Yield Limits</u>:

   <u>Sampling Requirements:</u>

8. <u>Record Requirements</u>:

9. <u>Check Weight Procedures:</u>

10. <u>Regulated By</u>:  FDA        Final Packaging Subject to FDA approval

11. <u>Stability Requirements</u>:



### Schedule 2 – Minimum Order Commitment (Number of Tablets)

| Product/ | Agreement Year One After First Commercial Sale (Number of Tablets and/or packets) | Agreement Year Two After First Commercial Sale (Number of Tablets and/or packets) | Agreement Year Three After First Commercial Sale (Number of Tablets and/or packets) | Agreement Year Four After First Commercial Sale (Number of Tablets and/or packets) | Agreement Year Five After First Commercial Sale (Number of Tablets and/or packets) |
|---|---|---|---|---|---|
| Allheart [to be adjusted based on three different sizes in next draft] | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| Prazitel | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| Zantel | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| Zerofen | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| Cat Wormer | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |

After the fifth Agreement Year after First Commercial Sale, the Minimum Order Commitment shall no longer apply in each Renewal Term.

### Schedule 3

### Deadlines for U.S. Registration

| Product | Deadline for U.S. Registration |
|---|---|
| Allheart | January 1, 2005 |
| Prazitel | January 1, 2005 |
| Zantel | January 1, 2005 |
| Zerofen | January 1, 2005 |
| Cat Wormer | January 1, 2005 |



## Schedule 4

## Pending Patent Issues

CHANELLE agrees to provide a full description of these Pending Patent Issues within 30 days of the signing of this Agreement

