IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| VIRBAC CORPORATION | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO.:  01:05-CV-01128 (RMU) |
| | § | |
| CHANELLE PHARMACEUTICALS | § | |
| MANUFACTURING LTD.; | § | JURY DEMANDED |
| | § | |
| THE HARTZ MOUNTAIN | § | |
| CORPORATION; | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF VIRBAC CORPORATION'S FIRST AMENDED COMPLAINT**

Plaintiff Virbac Corporation, ("Virbac"), for its First Amended Complaint (this "Complaint") against Chanelle Pharmaceuticals Manufacturing Ltd., and Hartz Mountain Corporation, (collectively referred to herein as "Defendants"), states as follows:

## I.    PARTIES

1.    Plaintiff Virbac Corporation is a Delaware corporation with its principal place of business at 3200 Meacham Boulevard, Fort Worth, TX  76137.

2.    Defendant Chanelle Pharmaceuticals Manufacturing Ltd. ("Chanelle") is an Ireland corporation with its principal place of business is at Athenry Road, Loughrea, Co. Galway, Ireland.  Chanelle has voluntarily accepted service through its counsel.

3.    Defendant Hartz Mountain Corporation ("Hartz"), is a New Jersey corporation with its principal place of business at 400 Plaza Dr., Secaucus, New Jersey 07094-3688.  Hartz has already voluntarily appeared in this action.

## II.     JURISDICTION AND VENUE

### Jurisdiction

4.     Subject matter jurisdiction is proper in the United States District Court for the District of Columbia pursuant to the provisions of 28 U.S.C. §1332 in that this matter is a civil action between citizens of different states, and in which citizens or subjects of a foreign state are additional parties wherein the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5.     This Court also has subject matter jurisdiction over this action pursuant to the provisions of 28 U.S.C. §1331 and §1338 in that this matter is a civil action arising under the Constitution, laws, or treaties of the United States. This action involves violations of Section 43 of the Lanham Act, 15 U.S.C. §1125, and Section 2 of the Sherman Act, 15 U.S.C. §2. This action also includes Texas common law claims. This Court has supplemental jurisdiction over the Texas common law claims under 28 U.S.C. §1367(a).

This Court has personal jurisdiction over all Defendants. Defendants have caused tortious injury in the District of Columbia by acts and omissions occurring in the District of Columbia, including but not limited to the publication and dissemination to the public of patent applications and other governmental disclosures (for example, filings with the Food and Drug Administration) that fraudulently claim ownership and invention of products belonging exclusively to Virbac. The agencies with which Defendants have filed such fraudulent disclosures and other filings are agencies of the U.S. Department of Commerce (in the case of the Patent and Trademark Office) and the U.S. Department of Health and Human Services (in the case of the U.S. Food and Drug Administration), both of which are headquartered in this District. Therefore, the effective situs of FDA decision making is in the District of Columbia. Responsibility for actions of the FDA is expressly delegated to the Secretary of the Department of Health and Human Ser-

vices ("HHS") located at 200 Independence Avenue in the District.    With respect to the FDA's

mission to "promote public health by promptly and efficiently reviewing clinical research and

taking appropriate action on the marketing of regulated products in a timely manner" (21 U.S.C.

§393(b)(1)) and "ensuring that human and veterinary drugs are safe and effective" (21 U.S.C.

§393(b)(2)(B)), the FDA enabling statute provides that the FDA shall carry out those functions

"as determined to be appropriate by the Secretary," who is located in this District  (21 U.S.C.

§393(b)(4).)  Moreover:

> The Secretary shall implement programs and policies that will foster collaboration
> between the Administration, the National Institutes of Health and other science-
> based Federal agencies, to enhance the scientific and technical expertise available
> to the Secretary in the conduct of the duties of the Secretary with respect to the
> development, clinical investigation, evaluation, and postmarket monitoring of
> emerging medical therapies, including complementary therapies, and advances in
> nutrition and food science.  [21 U.S.C. §393(c).]

6.    It is the Secretary of Health and Human Services (located in the District), and not

the FDA Commissioner, who is charged with the ultimate "duties  .  .  . with respect to the devel-

opment, clinical investigation, evaluation, and postmarket monitoring" of new drugs.  Finally,

the enabling statute expressly provides that "[t]he Secretary, through the Commissioner, shall be

responsible for executing this chapter" and, more particularly, for providing direction to the FDA

and establishing and implement policies, coordinating and overseeing entities within the FDA,

research relating to food and drugs, conducting educational and information programs, and "per-

forming such other functions as the Secretary may prescribe."  (21 U.S.C. §393(d)(2)(A) – (D).)

7.    The parties have transacted business in the District of Columbia, and have other

sufficient contacts with the District of Columbia to constitute minimum contacts for purposes of

personal jurisdiction under the District of Columbia long-arm statute (D.C. Code §14-423) and

the due process clause of the fifth and fourteenth amendments to the United States Constitution.

In particular, and not by way of limitation, Hartz markets and sells substantial quantities of its

consumer pet and veterinary products in the District of Columbia. Hartz has appeared voluntarily in this action and made an initial filing which does not challenge, and therefore concedes or waives any objections as to subject matter and personal jurisdiction. Chanelle also sells non-registered products in the United States including, Virbac is informed and believes, in the District of Columbia.

## Venue

8.    Venue is proper in this Court under 28 U.S.C. 1391(b)(1). Hartz is a resident of this District pursuant to 28 U.S.C. 1391(c) because it is subject to personal jurisdiction here, and Chanelle is an alien. Aliens may be sued in any district pursuant to 28 U.S.C. 1391(d). In such a case, venue for the entire action is proper in any district in which venue is proper as to the remaining defendants. Venue is proper as to Hartz under 1391(b)(1) because it is a resident of this District. The District of Columbia is a "State" for purposes of 1391(b)(1).

9.    Venue is also proper in this Court under 28 U.S.C. §1391(b)(2). A substantial part of the events or omissions giving rise to the claim occurred in this district. Defendants made false and fraudulent filings as to ownership and inventorship with the U.S. Patent and Trademark Office, an agency of the U.S. Department of Commerce, subject to the policy direction of the Secretary of Commerce (35 U.S.C. §1(a)) located in this District, and as to ownership of products with the Food and Drug Administration, an agency of the U.S. Department of Health and Human Services located in this District, whose Secretary is charged with ultimate responsibility for execution of the FDA's function (21 U.S.C. §§393(a), 393(d)(2)(A)).

10.    Moreover, Virbac has suffered specific damage in this District (as another "event giving rise to the claim" under §1391(b)(2)) through the prejudice to its own Food and Drug Administration filings related to the Products (as defined below) arising out of Defendants' false and fraudulent prosecution of patent applications, which, if patents issued thereon, would or

might cover the Products and prevent, or threaten to prevent, Virbac's ability to commercialize Products of which it is the sole owner.

11.     In the alternative, venue is proper in this District under 28 U.S.C. §1391(b)(3), which provides that if there is no District in which venue is otherwise proper, it may be brought in any District in which any defendant is found.  There is no other District in which venue is proper under Section 1391(b)(1) because all defendants do not reside in this District.  There is no other District in which venue is proper under Section 1391(b)(2) because there is no other District in which a substantial part of the events or omissions giving rise to the claim occurred or in which a substantial part of the property which is the subject of this action is located.  Virbac's principal place of business is in Texas, and it is a partly-owned subsidiary of a French company.  Chanelle, Burke, and Tripathi are in Ireland.  Hartz is in New Jersey.  Two other principal non-party entities are Blue Ridge Pharmaceuticals, Inc., a Delaware corporation with its principal place of business in North Carolina, and its parent and guarantor of certain of its obligations, IDEXX Laboratories, Inc., a Delaware corporation with its principal place of business in Maine.  The Patent and Trademark Office is physically situated in Alexandria, Virginia, and the Food and Drug Administration is physically situated in Rockville, Maryland.  (As noted, the entities with primary responsibility for the acts of these agencies are located in this District.)  The events that form the basis of this complaint took place in each of these locations, and in none of them did a "substantial part" of them occur.  Pursuant to §1391(b)(3), venue is proper where any defendant may be found.  Hartz and (Virbac is informed and believes) Chanelle may be found in this District through their retail sales here, and thus venue is proper here.

12.     In the alternative, venue is proper as regards Defendant Chanelle under 35 U.S.C. §293, which provides that "[e]very patentee not residing in the United States" who has not filed a designation of agent for service of process may be sued with respect to the "patent or rights

thereunder" (which includes claims as to ownership of patents) in the United States District Court for the District of Columbia. This complaint claims that Virbac is the rightful owner of the patent applications and demands that they be assigned to it or held in a constructive trust for its exclusive benefit. The applications in question have been published, and Defendants have provisional rights in the claimed inventions pursuant to 35 U.S.C. 154(d) and they are accordingly "patentees" within the meaning of §293. Venue is independently available as to Hartz under 28 U.S.C. §1391(b)(1) because it resides in the District.

### III.    CASE SUMMARY

13.    Virbac's claims arise from Defendants' appropriation and use of valuable confidential information belonging to Virbac or in which Virbac had exclusive rights, all without Virbac's knowledge or approval. Chanelle received and used this information with full knowledge of Virbac's rights in and ownership of the information, as well as its confidential nature. Chanelle, Burke, and Tripathi used Virbac's information to develop products to be sold to the public, to file patent applications before the United States Patent and Trademark Office ("USPTO") and the European Patent Office ("EPO"), and to file product approval applications with the United States Food and Drug Administration ("FDA"). In addition, the Defendants made false and misleading representations about the products to the World Intellectual Property Organization ("WIPO"), located in Geneva, Switzerland. In further violation of Virbac's rights, Chanelle transferred some or all of this information to Hartz. Hartz, and its employees Albert Ahn ("Ahn"), Ian Cottrell ("Cotrell"), Arima Das Nandy ("Nandy"), and Richard Fisher ("Fisher") thereupon used this information, which was still owned by Virbac, to file additional applications before USPTO, EPO, and, Virbac is informed and believes, the FDA. Hartz knew, or should have known, of Virbac's ownership of and rights in the information Chanelle disclosed

to it; in any event, Virbac has since advised Hartz that Virbac is the sole owner of the information.

14.     In the course of their activities, and continuing through the date of this Complaint, Defendants:

(a)     have misrepresented to the public the source and ownership of the information and of the applications and products based thereon;

(b)     have made false statements to USPTO, EPO, WIPO and FDA respecting the inventorship and ownership of claimed inventions, and the ownership of products;

(c)     have failed and refused to cease using Virbac's information;

(d)     have failed and refused to cease the development and commercialization of the products based on Virbac's information;

(e)     have failed and refused to assign to Virbac the fruits of Virbac's information, including but not limited to the subject patent and product approval applications;

(f)     have failed and refused to acknowledge Virbac's rights in the information or in the products, applications, and other fruits thereof; and

(g)     have disseminated Virbac's trade secrets to the public, and, in particular, to competitors and potential competitors of Virbac, enabling them to develop products competitive with products of which Virbac is the exclusive owner,

all of which acts have caused and continue to cause Virbac irreparable injury.

## IV.     FACTS

### Blue Ridge's Ownership of the Trade Secrets and Products

15.     In 1999, Blue Ridge Pharmaceuticals, Inc., a Delaware corporation based in North Carolina ("Blue Ridge"), was developing a series of liver-flavored veterinary products.  Those products were:

a.      a product containing ivermectin for treatment and prevention of heart-worm in dogs to be marketed under the trademark "IVERHART," and internally designated as "the 1G product";

b.      a product containing ivermectin and pyrantel pamoate for prevention of heartworms, hookworms, and roundworms in dogs, internally designated as "the 2G product";

c.      a product containing ivermectin, pyrantel pamoate, and praziquantel for the prevention of heartworms, hookworms, roundworms, and tapeworms in dogs, internally designated as "the 3G" product; and

d.      a product containing pyrantel pamoate for the prevention and treatment of roundworms and hookworms in dogs, referred to by Blue Ridge as "the Flavored Pyrantel Product"

(collectively, "Products").

16.      A nonparty, Blue Ridge, was a wholly-owned subsidiary of IDEXX Laboratories, Inc., a Delaware corporation ("IDEXX"). Blue Ridge has since changed its name to "IDEXX Pharmaceuticals, Inc." (Because it was known as "Blue Ridge" during most of the time period in question, this Complaint will continue to refer to it as "Blue Ridge.")

The Products, which have three active ingredients, are unique and innovative because, unlike other heartworm preventatives on the market today, the Products will be the first to prevent and control hookworms, roundworms and several species of tapeworms. No other combination available on the market today controls several species of tapeworms, along with the heartworm and hookworm preventatives in one product which was capable of being economically

produced in commercial volumes. Blue Ridge held the recipes, processes, ingredients, and other information respecting the Products not generally known to the public in confidence, and treated them as trade secrets ("Trade Secrets"), and with Virbac's support and assistance, further developed these Products. Chanelle used Virbac's information to develop products to be sold to the public, to file patent applications before the United States Patent and Trademark Office ("USPTO"), to file an application with the World Intellectual Property Association ("WIPO"), to file international patent applications under the provisions of the Patent Cooperation Treaty ("PCT"), and to file product approval applications with the United States Food and Drug Administration ("FDA").

17.    Blue Ridge submitted a suitability petition for the Products, and both the filing and the FDA's response to the filing are made public (the "Filings").

18.    Thus, as of December 22, 1999, the Trade Secrets were not known to the public or to competitors, and the Products had not been released to the public or to the veterinary products industry generally.

19.    The Products based on the Trade Secrets were at a very advanced state of development as of December 22, 1999. Although scale-up manufacturing remained to be developed, and while testing continued in connection with regulatory and product development, all of the material scientifically and technologically innovative work on the Trade Secrets and the Products was completed by that date. Anyone possessing the Trade Secrets as they existed on December 22, 1999, and thereafter could develop the Products with little additional scientific discovery and no additional inventive contribution

## The Development and Distribution Agreement between Blue Ridge and Virbac

20.    On December 22, 1999, Blue Ridge entered into a "Development and Distribution Agreement" with Virbac ("Development Agreement") (Exhibit A). It granted Virbac "the exclu-

sive rights to manufacture, have manufactured, market, sell and have sold the Products in the Ethical Market [i.e., the veterinary prescription market] in the Territory." (Exh. 1, Par. 2(a).) The Territory for all Products except the 3G product was the entire world; for the 3G product, the Territory was the United States and Canada.

21.     Virbac paid Blue Ridge $2,000,000 in two installments as an "acquisition fee." It agreed to make further payments when various regulatory and approval milestones were met, totaling an additional $2,250,000. Virbac also agreed to pay royalties to Blue Ridge ranging from 15% to 1% of net sales, depending on the Product and changes in competitive conditions as time passed.

22.     The parties acknowledged the confidential and proprietary nature of the Trade Secrets. Paragraph 10 of the Development Agreement provided:

> No proprietary information disclosed by either party to the other in connection with this Agreement, including, without limitation, the Know-How, shall be disclosed to any person or entity other than the recipient party's employees and contractors directly involved with the recipient party's use of such information who are bound by written agreements to protect the confidentiality of such information. Such information shall be used only for the purposes contemplated by this Agreement, and such information shall otherwise by protected by the recipient party from disclosure to others with the same degree of care accorded to its own proprietary information but not less than a reasonable degree of care. [Exh. A, Par. 10.]

"Know-How" was defined as "all technical information, data, studies, formulae, processes and other proprietary information of [Blue Ridge] now existing relating to Products including, without limitation, all formulation, manufacturing, scientific or clinical data cited, referenced or contained in any application for any Registration applied for by BRP." (Exh. A, Par. 1(e).) Trade Secrets as defined in this Complaint includes the Know-How.

23.    The confidential and proprietary nature of the Trade Secrets, including the Know-How, was further acknowledged by the parties' treatment of it as protectable intellectual property requiring a license for its use:

> [Blue Ridge] shall be the sole and exclusive owner of the Know-How. [Blue Ridge] shall have the exclusive, worldwide right, exercisable in its sole discretion and at its sole expense, to file, prosecute, defend and maintain patents and patent applications with respect to the Know-how (collectively , "[Blue Ridge] Patent Rights"). [Blue Ridge] hereby grants to [Virbac] an exclusive, worldwide, roy-alty-free license under the Know-How and the [Blue Ridge] Patent Rights, exer-cisable during the Term, to make, have made, use, sell and have sold Products in the Territory. [Exh. A, Par. 7(a).]

An "exclusive" license excludes not only third parties, it also excludes the licensor from using the intellectual property for its own commercial purposes. Virbac's exclusivity was extended to include any improvements Blue Ridge might develop. (Exh. A, Par. 7(c).)

24.    Blue Ridge also granted Virbac an exclusive license to the trademark "IV-ERHART" ("Trademark") in the Territory for the term of the agreement. Blue Ridge secured U.S. registration for IVERHART in 2001. (Exh. A, Par. 11(a).)

25.    Paragraph 12 of the Agreement provided for special protection for Virbac's ex-clusive Product rights in the United States and Canada:

> During the Term, neither [Virbac] or its affiliates nor [Blue Ridge] or its Affiliates shall, directly or indirectly, develop, manufacture, market or sell, *or assist any third party in developing, manufacturing, marketing or selling, any Competitive Products* in the United States or Canada. * * * The parties agree that the re-strictions contained in this Section 12 are reasonable for the purpose of preserving the exclusive rights granted to [Virbac] hereunder and for maximizing the sale of Products hereunder. [Exh. A, Par. 12; emphasis supplied.]

"Competitive Product" was defined as "a product having substantially the same formulation as a Product." (Exh. A, Par 1(k).)

26.    The Development Agreement imposed upon Virbac a number of duties typically required of exclusive licensees:

a.    Virbac was required to use "commercially reasonable efforts to create a market for, promote, supply the demand for and obtain maximum sales of the Products throughout all areas of the Territory," including advertising, exhibitions, and the like.  In this connection, the Development Agreement provided that:  "In determining the commercial reasonableness of [Virbac's] efforts, it shall be assumed that neither [Virbac] nor any of its Affiliates market or sell any products that compete with the Products in the Territory." (Exh. A, Par. 4(a).)

b.    Virbac was required to produce all promotional and advertising materials, artwork, packaging, and labeling.  (Exh. A, Par 4(b).)

c.    Virbac was required to select and secure a supply of the Products from FDA-approved manufacturers in accordance with commercial Good Manufacturing Practices and the Products own registrations.  (Exh. A, Par. 4(c).)  It was also responsible for dealing with the FDA on all issues relating to manufacturing compliance and quality assurance, packaging and labeling, promotional compliance, and medical issues.  (Exh. A, Par. 5(b)(i).

d.    Virbac was responsible for post-approval analytical testing and stability work for the Products.  (Exh. A, Par. 4(d).)

e.    Virbac was responsible for obtaining product approvals outside of the United States.  (Exh. A, Par. 5(b)(i).)

27.    At great expense, Virbac complied with all of its obligations under the Development Agreement.  It also expended large amounts of money preparing to comply with its terms at such time as Products were approved by the FDA.

28.     In substance, form, and intent, the Development Agreement transferred almost all worldwide rights and duties respecting the Trade Secrets and the Products from Blue Ridge exclusively to Virbac, with the exception of the territorial limitation for the 3G product to the U.S. and Canada, and certain regulatory requirements required of a veterinary product's owner.  The parties expressly provided that the parties would act to protect the value of these exclusive rights in Virbac's hands.  The "exclusive" license excludes not only third parties, it also excludes the licensor from using the intellectual property for its own commercial purposes.  Virbac's exclusivity was extended to include any improvements Blue Ridge might develop.  (Exh. A, Par. 7(c).)

## Blue Ridge's Disclosure to Chanelle of the Terms of the Development Agreement

29.     In September 2001, IDEXX and Blue Ridge requested permission from Virbac to disclose to Chanelle the terms of the Development Agreement.  This request included the contract terms *only*, and *not* the Trade Secrets or Products exclusively licensed to Virbac in the Development Agreement.  Virbac and Blue Ridge executed a letter agreement dated September 11, 2001 (Exhibit B), which stated:    "This letter reflects our understanding that [Virbac] consents to the disclosure by [Blue Ridge] to Chanelle Pharmaceuticals Manufacturing Ltd. of the *terms of the Development and Distribution Agreement*."  (Emphasis supplied.)

30.     Virbac is informed and believes that Blue Ridge did disclose the terms of the Development Agreement to Chanelle by providing Chanelle with a copy of it.  Thus, Chanelle was aware of the identity of the Products.  More importantly, it was aware that Chanelle had granted Virbac exclusive worldwide rights to the Products and the Trade Secrets (with the noted exceptions).

## The Product Transfer Agreement Between Blue Ridge and Virbac

31.     On December 13, 2001, Blue Ridge and Virbac entered into a Product Transfer Agreement whereby Blue Ridge transferred its entire interest in the Products and Trade Secrets

to Virbac.  (Exhibit C.)  In return for royalty payments (Exh. C, Par. 3), the Product Transfer
Agreement provided that Blue Ridge:

> hereby sells, assigns and transfers to [Virbac], free and clear of any and all liens
> and encumbrances, all of [Blue Ridge's] worldwide rights, title and interest in and
> to the Products, including all of [Blue Ridge's] Know-How, goodwill, Registra-
> tions, ANADAs, NADAs [new animal drug application] and INADs [investiga-
> tional new animal drug application] relating to the Products and the Iverhart.com
> URL, and in and to the trademark IVERHART[.]  Following the date hereof BRP
> shall have no further obligations with respect to the development, registration,
> manufacture or sale of Products except as specifically provided in this Agreement.
> [Exh. C, Par. 3]

32.    Blue Ridge represented and warranted that "to the best of its knowledge" it had
"not disclosed any proprietary information relating to the Products, including the Know-How and
the contents of any applications for Registrations, to any person or entity . . ."  other than Vir-
bac and the FDA.  (Exh. B, Par. 6(viii).)  Further, Paragraph 8 provided that "[Blue Ridge] shall
not disclose to any person other than [Virbac] any proprietary or confidential information relat-
ing to the Products, including the Know-How and the contents of any applications for Registra-
tions."  (Exh. B, Par. 8.)

33.    The Product Transfer Agreement also repeated Blue Ridge's promise that "neither
[Blue Ridge] nor its Affiliates shall, directly or indirectly, develop, manufacture, market or sell,
or assist any third party in developing, Manufacturing, marketing or selling, any product having
substantially the same formulation as a Product or any Pyrantel Combination Product ('Competi-
tive Product')."  (Exh. C, Par. 9.)

34.    Virbac is informed and believes that Chanelle was aware of the entry by Virbac
and Blue Ridge into the Product Transfer Agreement, and of its material terms.

### Competitive Value of Trade Secrets and Products to Virbac

35.    Virbac's exclusive right to the Products and Trade Secrets, and its subsequent out-
right purchase thereof, allowed Virbac to enjoy a competitive advantage over other competing

veterinary medicine pharmaceutical manufacturers.  Virbac's exclusive right to use and owner-
ship of information relating to the chemical composition and method of manufacture of each of
the Products gave Virbac a distinct advantage over its competitors.  The Development and Prod-
uct Transfer Agreements with Blue Ridge and IDEXX also ensured that it would enjoy efficien-
cies in time-to-market and the development of manufacturing that its competitors would lack.
Virbac maintained and has continued to maintain the confidential nature of the Trade Secrets as-
sociated with the Products.

36.    Throughout this period and continuing to date, Virbac invested substantial sums
of money, time and effort in further developing and refining its manufacturing techniques and
methods in preparation for the sale of the Products.  This significant investment of resources was
in addition to the millions of dollars already paid to Blue Ridge pursuant to the Development
Agreement.

### Blue Ridge's Disclosure of Trade Secrets to Chanelle; Chanelle's Subsequent Disclosures to Hartz

37.    Without obtaining permission from Virbac as required by the Development
Agreement and Product Transfer Agreement, and without Virbac's knowledge, Blue Ridge and
IDEXX disclosed the Trade Secrets associated with the Products to Chanelle. This disclosure
took place at a time and in a manner unknown to Virbac.  However, Virbac is informed and be-
lieves that this disclosure took place after Blue Ridge had disclosed (with Virbac's permission)
the terms of the Development Agreement to Chanelle.  Chanelle was thus aware of Virbac's ex-
clusive rights in the Products and the Trade Secrets, especially in the United States and Canada.
Virbac is informed and believes that Chanelle was also aware of the outright transfer of the
Products and Trade Secrets to Virbac that took place three months later in the Product Transfer
Agreement.

38.     Virbac is informed and believes that, in 2002, Chanelle falsely represented to Hartz that it (Chanelle) owned and developed the Trade Secrets and Products.  It conveyed some or all of the Trade Secrets to Hartz pursuant to a "Mutual Confidentiality Agreement" dated as of January 22, 2002.  On or around January 10, 2003, Chanelle and Hartz entered into a "Confidential License and Supply Agreement" whereby Chanelle granted Hartz the right to sell the Products, and in which they divided the world into various exclusive and non-exclusive (joint) territories for their respective marketing of the Products.  The "Confidential License and Supply Agreement" further provided that Chanelle would manufacture the Products and sell them to Hartz.

39.     The "Confidential License and Supply Agreement" stated in its preamble that Hartz and Chanelle had developed "various products" described in Schedule 1 to the Agreement.  These were the products already developed by Blue Ridge and Virbac and transferred exclusively to Virbac.   The parties recognized that they were competitively valuable, and they agreed to keep information exchanged between them confidential in Paragraph 15 thereof.

40.     Virbac is informed and believes that Hartz knew or should have known that the Chanelle's statements as to the ownership and development of the Trade Secrets and Products were false.  If Hartz did not know of their falsity at the time, it became aware of their falsity later, when Virbac advised it of the true circumstances of the ownership and development of the Trade Secrets and the Products.

### Defendants' Filing of False and Deceptive Patent Applications and Their Publication

41.      Despite the fact that no employee of either Virbac or Hartz invented or originally developed the subject matter of the Trade Secrets and the Products (rather, Blue Ridge and Virbac did), Defendants Burke and Tripathi, and Ahn, Cottrell, Nandy, and Fisher (the "Claimed

Inventors"), each of whom was an employee of Chanelle or Hartz, swore under oath that they were inventors of the Products when they variously filed the following U.S. Patent Applications:

-- U.S. Patent Application Serial No. 10/637,807 (Burke, Tripathi, Ahn, Cottrell) (assigned to Hartz and Chanelle)

-- U.S. Patent Application Serial No. 10/800,407 (Cottrell, Nandy, Ahn, Fisher) (assigned to Hartz and Chanelle)

("U.S. Applications") on or about August 8, 2003.

42. The U.S. Applications were published on or about February 10, 2005 as U.S. Patent Application Publication No. US2005/0032718 and U.S. Patent Application Publication No. US2005/0032719, respectively. Virbac, the rightful owner of the Trade Secrets and Products, was not listed as the inventor, owner, or assignee of record in the U.S. Applications.

43. Defendants also filed International Patent Applications with the EPO under the provisions of the Patent Cooperation Treaty, as follows:

-- Serial number PCT/US2004/025000 (Cottrell, Nandy, Ahn, Fisher) (assigned to Hartz and Chanelle)

-- Serial number PCT/US2004/025005 (Burke, Tripathi, Ahn, Cottrell) (assigned to Hartz and Chanelle)

-- Serial number PCT/US2004/025006 (Burke, Tripathi, Ahn, Cottrell) (Assigned to Hartz and Chanelle)

("PCT Applications") on or about August 3, 2004. The PCT Applications were published on or about February 24, 2005 as WO2005/016356, WO2005/016357, and WO2005/016358, respectively. Virbac, the rightful owner of the Products, was not listed as the inventor, owner, or assignee of record in the PCT Applications.

44. The publication of the U.S. Applications and the PCT Applications were false and deceptive representations to the public respecting the source and ownership of the Products. The Claimed Inventors (including Defendants Burke and Tripathi) misrepresented that they were in-

ventors of the Products, and Chanelle and Hartz misrepresented that they were the owners of the U.S. Applications and the PCT Applications, and hence, of rights to the Products. Moreover, these publications represented the unauthorized and wrongful disclosures of the Trade Secrets by Defendants.

45.    Inventors and assignees have a duty to disclose to the patent examining bodies any and all information material to the examination of the application. They failed to do so prior to the time these applications were published.

46.    The U.S. Applications and the PCT Applications are, in form and substance, reca-pitulations of significant portions of the Trade Secrets with no material inventive contribution by the claimed individual inventors.

47.    The patent examiner at the USPTO has issued both an "office action" and a "final office action" which presently reject the patent claims asserted by Defendants in the U.S. Appli-cations. If the U.S. Applications are not placed in condition for allowance, and another applica-tion that claims priority to the U.S. Applications is not filed by the due date for responding to the "final office action," the U.S. Applications will go abandoned. If the claims are abandoned, Vir-bac will lose its whatever mitigating rights it may have to prevent competitors from making, manufacturing, using, selling, or offering for sale the subject matter disclosed in the U.S. Appli-cations.

48.    Defendants' actions have already irreparably damaged Virbac by exposing the Trade Secrets that are associated with the Products. That damage will be greatly compounded by the loss of Virbac's ability to obtain patent protection for the Products.

49.    Defendants have also further compounded this problem and exposed Virbac to additional irreparable and immediate harm by committing fraud on the USPTO and EPO and by failing to properly prosecute the U.S. Applications and the PCT Applications. Accordingly, if

this Court does not enjoin Defendants from their continued wrongful activity and compel the assignment of the U.S. Applications and the PCT Applications to Virbac, the value of Virbac's exclusive rights to the 2G and the 3G Products for which it bargained in the Development and the Product Transfer Agreements will be completely destroyed.

### Defendants' Filings with the FDA

52.     The Defendants did not disclose under their duty of candor to the patent office of all material information regarding patentability that the Defendants received the Trade Secrets from Blue Ridge in either of the U.S. Applications.  Yet, the individual Defendants maintained that they were the inventors in each of the U.S. Applications.  The patent examiner at the USPTO has not issued an "office action," or a statement regarding patentability on behalf the USPTO, with respect to U.S. Patent Application Publication No. US2005/0032719 at this time.  The patent examiner at the USPTO has issued, however, an initial office action and a "final" office action which reject the patent claims asserted by Defendants in the U.S. Application Publication Number US2005/0032718.  Defendants have already made limiting amendments and declarations under oath that can seriously effect the scope of protection of any claims that issue.  Moreover, in response to the examiner's indication after the Defendants' amendments and arguments following the final office action, the Defendants filed a Request for Continued Examination ("RCE").  Amendments to the claims and arguments that also limit the scope of protection were part of the RCE filing.  On or about September 20, 2005, the examiner issued another office action in response to the RCE in which the examiner indicated that all but two claims are allowable.  If the claims are allowed to issue without the filing of another application claiming priority to U.S. Application Publication Number US2005/0032718, Virbac will can lose some of its rights to prevent competitors from making, manufacturing, using, selling, or offering for sale the subject matter disclosed in the U.S. Applications.  Moreover, Virbac will lose the ability

to recapture some of the scope of protection lost through the limiting amendments and arguments made by the Defendants. Furthermore, if the Defendants choose to let the claims indicated as allowable issue as a patent, Virbac will be at risk of losing its ability to commercialize and sell the Products it purchased and further developed without the threat of being sued for infringement.

## Hartz's Acquisition By Sumitomo

53.    In or around June 2004, Hartz was acquired by Sumitomo Corporation. Virbac is informed and believes that Hartz represented to its agents (including investment bankers) and to potential acquirors that its product and intellectual property portfolio included the Trade Secrets and the Products, and that Hartz had the right to own them and to make, use, and sell the Products. These representations were false.

## V.    CAUSES OF ACTION

50.    All conditions precedent to Plaintiff's claims have been performed or will be performed. Each of the following counts adopts and incorporates by reference all of the foregoing paragraphs.

## Count I
## Violation of Section 43(a)(1)(A) of the Lanham Act

51.    Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. §1125(a), provides that any person who . . . in connection with any goods . . . uses in commerce . . . any false designation of origin, false or misleading description of fact, or false and misleading representation of fact which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be

liable in a civil action by any person who believes that he or she is likely to be damaged by such act."

52.    Defendants made false designations of origin, false or misleading descriptions of fact, and false or misleading representations of fact as to the affiliation, connection, and association of Virbac's Products, falsely and fraudulently claiming that the Products belonged to them and that they invented them and owned the inventions.  These misrepresentations appeared in published patent applications and filings with the FDA. These actions in commerce have caused or are likely to cause confusion, mistake, and deception as to the origin, sponsorship, or approval of Virbac's goods, which have caused and are likely to cause material damage to Virbac.

53.    Such misrepresentations have created confusion in the public.  This deception or confusion is material, and is likely to influence investment or purchasing decisions of prospective customers, distributors, licensees, and investors.

54.    Defendants' actions were intentional, fraudulent, deliberate and willful.  Therefore, this is an exceptional case under 15 U.S.C. §1117.

### <u>Count II</u>
### Violation of Section 43(a)(1)(B) of the Lanham Act

55.    Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. §1125(a), provides that any person who  .  .  .  in connection with any goods  .  .  . uses in commerce  .  .  .  any false designation of origin, false or misleading description of fact, or false and misleading representation of fact which in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods  .  .  .  or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act."

56.     Defendants, in connection with goods and services used in commerce, have made false designation of origin, false or misleading description of fact, and false or misleading representation of fact, which in commercial advertising or promotion misrepresented the nature, characteristics, qualities, and geographic origin of Virbac's Products, which will likely cause material damage to Virbac.  Chanelle engaged in the commercial solicitation of Hartz for a manufacturing and supply relationship with respect to the Products, in the course of which it misrepresented the nature, characteristics, and geographic origin of the Products.  Similarly, Hartz misrepresented the nature, characteristics, and geographic origin of the Products in its commercial solicitation of acquisition candidates, which efforts culminated in its acquisition by Sumitomo Corporation in June 2004.

57.     Virbac has been, and is likely to continue to be, damaged by such acts.

58.     Defendants' actions were intentional, fraudulent, deliberate and willful.  Therefore, this is an exceptional case under 15 U.S.C. §1117.

<u>**Count III**</u>
**Violation of Section 2 of the Sherman Act**

59.     Section 2 of the Sherman Act, 15 U.S.C. §2, prohibits any "attempt to monopolize, or combine or conspire with any other persons or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations[.]"   Section 4 of the Clayton Act, 15 U.S.C. §15, provides that inured persons may sue violators and recover treble damages.  Fraud on the USPTO may serve as the basis for finding a violation of Section 2 of the Sherman Act.

60.     The Defendants engaged in fraud on the USPTO by claiming under oath that they invented the subject matter of the U.S. Applications and by failing to tell the USPTO material information pursuant to their duty of disclosure under 37 CFR §1.56.  The sworn statements of

Defendants' employees, Burke and Tripathi, and of Ahn, Cotrell, Nandy, and Fisher, were knowingly false because the subject matter of the U.S. Applications and the PCT Applications, and the Trade Secrets associated with these applications, was known to them not to have been invented or originally developed by them, but to have been developed by Blue Ridge and Virbac, and owned or exclusively controlled by Virbac, in essentially the same form in which it was claimed in the U.S. Applications. The USPTO relied on these sworn statements as evidenced by the fact that these individuals have been listed as the inventors in the U.S. Applications.

61.    Defendants Chanelle and Hartz also committed fraud by claiming ownership through assignments of the U.S. Applications and the PCT Applications and by filing said assignments for recordation by the USPTO and EPO.

62.    Virbac is informed and believes that Defendants intend to continue to prosecute the U.S. Applications and the PCT Applications and, if they are able to achieve issuance, to assert the issued patents against Virbac.

63.    Defendants have attempted and conspired to attempt to monopolize the market for in the United States. They have committed the described acts with the specific intent to achieve monopoly power, and the acts carry with them a dangerous probability that they will successfully monopolize this relevant market in the United States.

## Count IV
### Misappropriation of Trade Secrets

64.    The Trade Secrets associated with the Products, prior to their commercialization by Virbac, were and are trade secrets under Texas law and the law of many other jurisdictions. Virbac had exclusive rights to, and later owned, the Trade Secrets.

65.    Chanelle acquired the Trade Secrets, including the confidential subject matter of the Development Agreement and Product Transfer Agreement pertaining to the Products,

through its course of dealings with Blue Ridge and IDEXX.  Chanelle, Burke, and Tripathi had notice of Virbac's exclusive ownership of the Trade Secrets through their knowledge of the Development Agreement and of Virbac's course of dealings with Blue Ridge and IDEXX.  Hartz acquired the Trade Secrets through its course of dealings with Chanelle and was either aware of Virbac's rights in the Trade Secrets, or became aware of them at a later date.

66.    Defendants used Virbac's Trade Secrets and converted them to their own purposes.  Defendants' actions constitute misappropriation of trade secrets under Texas law and have caused Virbac's confidential information, including but not limited to the Trade Secrets, to be exposed in the public domain and left unprotected, which has allowed Virbac's competitors to gain a competitive advantage without the expenditures of time, effort and money made by Virbac.  The situs of Virbac's Trade Secrets is at its headquarters in Fort Worth, Texas.  The harm suffered by Virbac as a result of Defendants' misappropriation of Virbac's Trade Secrets was experienced at its headquarters in Fort Worth, Texas and a substantial amount of Defendants' misappropriation took place in Fort Worth, Texas.  Texas has a substantial interest in preserving and protecting the confidential information of its residents, like Virbac in this case.  Moreover, the relationship between Virbac and the Defendants is centered in Fort Worth, Texas.

67.    Defendants' misappropriation of Virbac's Trade Secrets was intentional, willful and malicious.  Therefore, to prevent this type of conduct in the future, Virbac is entitled to recover punitive damages from Defendants.

## Count V
## Common Law Unfair Competition

68.    Virbac acquired and assisted in the creation of the Trade Secrets and the Products through the employment of extensive time, labor, skill, and money.

69.     Defendants have misappropriated, used, and commercialized the Trade Secrets and Products in competition with Virbac.  They have attempted to gain a special advantage over Virbac by filing patent applications and thereby attempting to exclude Virbac from the market.

70.     A substantial amount of Defendants' conduct leading to the injury suffered by Virbac occurred in Texas and the injury to Virbac was felt in Texas

71.     The Products and Trade Secrets have a unique pecuniary interest derived from Virbac's time, effort and money, which gave Virbac a business advantage over its competitors.  Once acquired, Defendants misrepresented that the Products as well as the methods and/or process of producing the Products were their own.  In addition, Defendants failed to properly acquire the Trade Secrets pertaining to the Products for valid consideration, develop it, or refine it.  Because of Defendants' unfair competition, Virbac has lost the ability to protect the Trade Secrets associated with the Products and  has suffered commercial damage and injury.

## Count VI
## Conversion

72.     Virbac owned, possessed and had the right to immediate possession of personal property consisting of the Products and the Trade Secrets.

73.     Defendants have accordingly converted property belonging to Virbac, which included the Trade Secrets associated with the Products covered by the Development Agreement and Product Transfer Agreement.  Defendants wrongfully and intentionally exercised dominion and control over Virbac's property inconsistent with the rights of Virbac and without just cause.

74.     Virbac has suffered injury as a result of the conversion. Virbac is entitled to the return of its property through the assignment of the U.S. Applications and the PCT Applications, together with equitable relief and/or damages for the injury caused by Defendants.

75.    Defendants' actions constitute conversion under Texas law.  Indeed, the situs of the Trade Secrets is in Texas, a substantial amount of the conduct underlying Defendants' conversion occurred in Texas and the injury felt by Virbac as a result of Defendants' conversion was felt in Texas.  Moreover, Texas has a substantial interest in protecting its residents from Defendants' conduct in this case.

76.    Defendants' conversion and theft of Virbac's intellectual property and their fraudulent filing of the U.S. Applications and the PCT Applications was intentional, willful and malicious.  Therefore, to prevent this type of conduct in the future, Virbac is entitled to recover punitive damages from Defendants.

<u>Count VII</u>
**Tortious Interference with Contract**

77.    The Development Agreement between Blue Ridge and Virbac gave Virbac the exclusive right to "make, have made, market and sell" the Products.  Virbac also acquired the "exclusive" right and use of the Trade Secrets in the Development Agreement.

78.    Blue Ridge disclosed to Defendant Chanelle the terms of the Development Agreement conveying exclusive rights in the Products and Trade Secrets to Virbac.   Virbac is informed and believes that Chanelle was also aware of the existence and material terms of the Product Transfer Agreement.  At all times relevant to this lawsuit, Defendant Chanelle was aware of Virbac's exclusive rights in the Products and/or Trade Secrets.  Virbac is informed and believes that Hartz knew about Virbac's exclusive rights in and ownership of the Products and Trade Secrets, or became aware of them prior to the date of this lawsuit.

79.    With full knowledge of Virbac's exclusive rights in the Products and Trade Secrets, Defendants willfully and intentionally acted to interfere with the Development Agreement and/or the Product Transfer Agreement by: (i) using the Trade Secrets; (ii) developing and mak-

ing Products; (iii) seeking to appropriate exclusive rights to itself, and to exclude Virbac from the market, by filing patent applications on the Products; (iv) disclosing the Trade Secrets and Products to the public through the publication of their patent application filings and disclosures; and (v) preparing to commercialize the Products in illegal competition with Virbac. Defendants were not privileged to commit, or justified in committing, any of these acts. Taken singly and together, these acts were intended to, and had the effect of, destroying Virbac's ability to exercise its contractual rights and Blue Ridge's ability to fulfill its contractual obligation to convey exclusive rights in and good title to the Products and Trade Secrets.

80.    Defendants' actions constitute tortious interference with contract under Texas law. Indeed, the situs of the Trade Secrets is in Texas, a substantial amount of the Defendants' interference occurred in Texas and the injury felt by Virbac as a result of Defendants' interference was felt in Texas. Moreover, Texas has a substantial interest in protecting its residents from Defendants' interference.

81.    Each of these acts has proximately caused Virbac actual damage and loss in a substantial and unliquidated amount by depriving it of the benefit of the exclusive rights conveyed to it in the Development Agreement and/or the Product Transfer Agreement. Defendants' intentional interference with contract was intentional, willful and malicious. Therefore, Virbac is entitled to recover punitive damages from Defendants.

<u>**Count VIII**</u>
**Tortious Interference with Prospective Economic Advantage**
**or Prospective Business Relations**

82.    As a result of the Development Agreement and/or the Product Transfer Agreement, Virbac had a reasonable expectation that it would continue to enjoy the economic benefits of its exclusive rights in the Products and Trade Secrets. It reasonably anticipated that the veterinary and over-the-counter market would find the Products highly desirable, and that its exclu-

sive rights would enable it to enter into economically advantageous contracts, agreements, and business relationships with its customers and others.

83.    With full knowledge of the reasonable probability that Virbac's exclusive rights in the Products and Trade Secrets would enable it to enter into business relationships and contracts, Defendants willfully and intentionally acted to interfere with Virbac's entry into such relationships by:  (i) developing and making the Products; (ii) disclosing the Trade Secrets to the public through their patent application filings and disclosures; (iii) seeking to appropriate exclusive rights to itself, and to exclude Virbac from the market, by filing for patent applications on the Products ; and (iv) preparing to commercialize the Products in illegal competition with Virbac. Defendants were not privileged to commit, or justified in committing, any of these acts.  Taken singly and together, these acts were intended to, and had the effect of, interfering with Virbac's ability to enter into advantageous business relations and contracts arising out of  the exclusive rights acquired in the Development Agreement and/or the Product Transfer Agreement.

84.    Defendants' actions constitute tortious interference with prospective economic advantage and business relations under Texas law.  Indeed, the situs of the Trade Secrets is in Texas, a substantial amount of the Defendants' interference occurred in Texas and the injury felt by Virbac as a result of Defendants' interference was felt in Texas.  Moreover, Texas has a substantial interest in protecting its residents from Defendants' interference.

85.    Each of these acts has proximately caused Virbac actual damage and loss in a substantial and unliquidated amount by depriving it of the benefit of the reasonably anticipated advantageous business relations and contracts.  Defendants' intentional interference with contract was intentional, willful and malicious.  Therefore, Virbac is entitled to recover punitive damages from Defendants.

## Count IX
## Conspiracy

86.    Defendants have combined together and agreed to steal Virbac's confidential information covered by the Development Agreement and the Product Transfer Agreement, including the Trade Secrets associated with the Products.  Defendants' conspiracy has destroyed Virbac's advantage over its competitors and has destroyed the value of its confidential information covered by the Development Agreement and the Product Transfer Agreement, including the Trade Secrets associated with the Products.

87.    Defendants' actions constitute conspiracy under Texas law.  Indeed, the situs of the Trade Secrets is in Texas, a substantial amount of the conduct underlying Defendants' conspiracy occurred in Texas and the injury felt by Virbac as a result of Defendants' conspiracy was felt in Texas.  Moreover, Texas has a substantial interest in protecting its residents from Defendants' conduct in this case.

## PRAYER FOR RELIEF

88.    Plaintiff adopts and incorporates by reference all foregoing paragraphs.

## Injunctive and Other Equitable Relief

89.    ***Irreparable Harm.*** Virbac has suffered and will continue to suffer irreparable harm absent the entry of temporary, preliminary, and permanent injunctive relief.  This irreparable injury includes, but is not limited to:

    a.    Continued disclosure of the Trade Secrets;

    b.    Continued claims to ownership of the Trade Secrets and the Products;

    c.    Continued commercialization of Products belonging exclusively to Virbac;

    d.    Continued threat of acquiring patents pursuant to the U.S. Applications and the PCT Applications which would cover the Products and threaten Virbac's ability to commercialize and sell the Products; and

     e.     Continued threat of the issuance of patents which would be invalid because of Defendants' fraud on the USPTO and EPO, and, absent competent and truthful correction thereof, the likelihood that no patent properly assigned to Virbac will issue,

resulting in, at best, a total loss of the value of the Trade Secrets and Virbac's rights in the Products resulting from exclusivity, and, at worst, Virbac's ability to commercialize and sell the Products belonging exclusive to it at all without the risk of infringing the patents sought by Defendants.

90.    ***Inadequate Legal Remedy.***  Virbac is without an adequate legal remedy to cure the irreparable harm caused by Defendants' actions.  If Defendants are permitted to continue their illegal course of conduct, Virbac may be prevented from using its Trade Secrets and Products at all into the indefinite future, and will at a minimum be deprived of the value for which they bargained in acquiring them.  The amount of pecuniary loss to Virbac is uncertain of precise calculation.

91.    ***Likelihood of Success on the Merits.***  Virbac is likely to succeed on the merits of its claims against Defendants.  Virbac's exclusive ownership of the Trade Secrets and the Products is unambiguous.  Chanelle's misappropriation thereof, and its transmission of this information to Hartz, is similarly beyond dispute, and each parties' use of this information to claim inventorship and ownership of Trade Secrets and Products, is of public record.  All elements of each cause of action will be established by a preponderance of the evidence.

92.    ***Balance of Equities.***  The balance of equities strongly favors Virbac.  Virbac has documented rights in the Trade Secrets and Products, and Defendants have none.

93.    Virbac respectfully requests that this court issue, on appropriate motion, a temporary, preliminary, and permanent injunction:

a.      ordering Defendants to assign all rights they may have in the U.S. Applications and the PCT Applications to Virbac;

b.      enjoining Defendants and their employees, agents or other representatives and all persons in active concert or participation with Defendants or under their authority from representing that they are the owners, title holders or inventors of the subject matter in the U.S. Applications and the PCT Applications;

c.      enjoining Defendants and their employees, agents or other representatives and all persons in active concert or participation with Defendants or under their authority from registering, making, selling or otherwise distributing the Products;

d.      enjoining Defendants and their employees, agents or other representatives and all persons in active concert or participation with Defendants or under their authority from using or disclosing any confidential information or trade secrets belonging to Virbac, including the Trade Secrets;

e.      placing the U.S. Applications in a constructive trust for the benefit of Virbac under such terms as would enable Virbac to assume control over the prosecution until inventorship and ownership issues are resolved by USPTO;

f.      enjoining Defendants and their employees, agents or other representatives and all persons in active concert or participation with Defendants or under their authority from prosecuting the U.S. Applications and the PCT Applications, or alternatively, from allowing the U.S. Applications and the PCT Applications to issue or to be abandoned without filing continuation patent applications in order to protect any remaining patentable rights Virbac may be able to secure;

g.      placing all revenues, contracts, and other benefits flowing to Defendants from their use of the Trade Secrets and sale of Products in a constructive trust for the exclusive benefit of Virbac;

h.      requiring Defendants to return all tangible manifestations of the Trade Secrets and Products to Virbac; and

i.      enjoining Defendants from using the Trade Secrets or the Products in any fashion or form.

**Declaratory Relief**

94.     Virbac respectfully requests that this Court issue an order, pursuant to 28 U.S.C. §2201, declaring:

a.      That Virbac is the sole owner of the Trade Secrets and the Products.

b.      That Defendants have no ownership or other rights in the Trade Secrets and the Products.

**Actual and Other Damages**

95.     Virbac respectfully requests that the Court issue an order awarding Virbac all of its actual damages, which exceed $75,000, to the extent ascertainable, together with punitive, consequential, and incidental damages, and all pre- and post-judgment interest allowed by law.

**Attorney's Fees**

96.     Virbac is entitled to recover its reasonable and necessary attorneys' fees, expenses, and court costs, pursuant to 15 U.S.C. §1117(a).  More specifically, Virbac is entitled to a recovery of its attorneys' fees in this case because Defendants' actions as described above, were fraudulent, deliberate, willful and intentional.  Accordingly, this case is "exceptional" under 15 U.S.C. §1117(a).

## VI.    **DEMAND FOR TRIAL BY JURY**

97.    Pursuant to Fed. R. Civ. P. 38, Plaintiff respectfully demands a trial by jury in this cause.

Respectfully submitted,


_____
/s/ Richard D. Horn

Richard D. Horn, Esq.
  D.C. Bar #425945
Bracewell & Giuliani LLP
2000 K Street, N.W., Suite 500
Washington, D.C. 20006
Telephone: (202) 828-5800
Facsimile: (202) 223-1225
richard.horn@bracewellgiuliani.com

ATTORNEYS FOR PLAINTIFF
VIRBAC CORPORATION

OF COUNSEL:

Elizabeth D. Whitaker
TX State Bar No. 00000078
Michelle E. Roberts
TX State Bar No. 17014435
Debra K. Thomas
TX State Bar No. 24003046
Bracewell & Giuliani LLP
500 North Akard Street, Suite 4000
Dallas, Texas 75201
Telephone:  (214) 758-1000
Facsimile:   (214) 758-1010

John H. Barr, Jr.
   TX State Bar No. 00783605
Richard F. Whiteley
   TX State Bar No. 24013744
Christopher D. Northcutt
   TX State Bar No. 24028558
Bracewell & Giuliani LLP
711 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713) 223-2300
Facsimile: (713) 221-1212

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of October, 2005, I caused a true and correct copy of

the foregoing to be served by electronic mail on the following persons:

Timothy C. Bass
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, DC  20006

Eric S. Aronson
Douglas R. Weider
Todd L. Schleifstein
Greenberg Traurig, LLP
200 Campus Drive, P.O. Box 677
Florham Park, NJ  07932

L. Barrett Boss
Cozen O'Connor, PC
1667 K Street, N.W., Suite 500
Washington, DC  20006

and by first-class, postage prepaid, upon:

John C. Barnoski
Cozen O'Connor
1900 Market Street
Philadelphia, PA  19103

_____
            /s/  Richard D. Horn
            Richard D. Horn