# DEVELOPMENT AND DISTRIBUTION AGREEMENT

Agreement made as of this 22nd day of December, 1999, by and among Blue Ridge Pharmaceuticals, Inc. a Delaware corporation having its principal place of business at 4249-105 Piedmont Parkway, Greensboro, NC 27410 ("BRP"), Virbac Corporation, a Delaware corporation, having its principal place of business at 3200 Meacham Boulevard, Ft. Worth, TX 76137 ("VBAC") and, for purposes of Section 17 only, IDEXX Laboratories, Inc., a Delaware corporation having its principal place of business at One IDEXX Drive, Westbrook, Maine 04092 ("IDEXX"), and Virbac S.A. ("VBSA"), a French corporation having it principal business at Carros Cedex, France.

## RECITAL

A.    BRP is in the process of developing and registering a liver-flavored Ivermectin-based drug (currently being developed under the working name "Iverhart™") for treatment and prevention of heartworms in dogs only, as further and more specifically described in that certain abbreviated new animal drug application ("ANADA") # 200-270, filed with the U.S. Food and Drug Administration Center for Veterinary Medicine ("FDA/CVM") (hereinafter referred to as the "1G Product").

B.    BRP is in the process of developing and registering a liver-flavored Ivermectin and Pyrantel Pamoate-based product for treatment and prevention of heartworms, hookworms and roundworms in dogs only, as further and more specifically described in that certain ANADA # 10-264, filed with FDA/CVM (hereinafter referred to as the "2G Product").

C.    BRP is in the process of developing and registering a liver-flavored Ivermectin, Pyrantel Pamoate, and Praziquantel-based product for treatment and prevention of heartworms, hookworms, roundworms and tapeworms in dogs only, as further and more specifically described in that certain investigational new animal drug application ("INADA") # 10-404, filed with FDA/CVM (hereinafter referred to as the "3G Product").

D.    BRP is in the process of developing a liver-flavored Pyrantel Pamoate product for use in treatment and prevention of roundworms and hookworms in dogs only, as further and more specifically described in that ANADA # 200-281, filed with FDA/CVM (hereinafter referred to as the "Flavored Pyrantel Product").

E.    VBAC wishes to obtain the exclusive right to make, have made, market and sell the 1G Product, 2G Product, 3G Product and Flavored Pyrantel Product (collectively, the "Products") and BRP wishes to grant such rights to VBAC, on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, the parties agree as follows:

1. Definitions.  As used herein, the following terms shall have the following meanings:

(a) "Affiliate" means, with respect to a party, a person or entity that controls, is controlled by or is under common control with, such party.

(b) "Products" shall have the meaning ascribed to such term in the RECITAL.

(c) "FDA/CVM" shall have the meaning ascribed to such term in the RECITAL.

(d) "Registrations" means the registrations of the Products with FDA/CVM or any registrations, licenses or approvals of any Regulatory Agency in any country or territory outside the United States performing a function comparable to FDA/CVM, in each case required to market and sell the Products in such country or territory. The Registrations are each individually referred to as a Registration.

(e) "Know-How" means all technical information, data, studies, formulae, processes and other proprietary information of BRP now existing relating to Products including, without limitation, all formulation, manufacturing, scientific or clinical data cited, referenced or contained in any application for any Registration applied for by BRP.

(f) "Territory" means the world with respect to the 1G Product, 2G Product and Flavored Pyrantel Product; the United States and Canada with respect to the 3G Product.

(g) "Regulatory Agency" means, in the U.S., FDA/CVM, and in any other country or territory, any governmental, administrative or regulatory body responsible for the administration and enforcement of laws, rules and regulations relating to the development, manufacture, marketing and sale of veterinary pharmaceutical products.

(h) "Term" means, with respect to each Product, unless terminated earlier pursuant to Section 14, the period of time beginning on the date of Registration of such Product and ending 15 years after such date, provided, however, that such period shall automatically be extended by additional two-year periods unless either party shall have given notice to the other party at least six months prior to the end of such 15-year period or any two-year extension.

(i) "Net Sales" means the gross sales of Products by VBAC or its Affiliates, agents, or subdistributors, less returns, discounts and price reductions actually taken and reasonable free goods.

(j) "U.S." means the United States of America.

(k) "Competitive Product" means a product having substantially the same formulation as a Product.

(l) "FDC Act" means the U.S. Food, Drug and Cosmetic Act, as amended, and the regulations promulgated thereunder.

(m) "cGMP" means current Good Manufacturing Practices promulgated or endorsed by the U.S. Food and Drug Administration, or comparable standards of the applicable Regulatory Agency in any jurisdiction outside of the U.S.

(n) "Ethical Market" means the market for products sold pursuant to prescriptions by or through veterinarians.

(o) "Farm and Fleet Sector" means retail outlets that offer a range of livestock and animal products beyond pet products, including but not limited to, rural/urban feed dealers and organizations such as Southern States Cooperative and Tractor Supply Company.

(p) "Pet Specialty Channel" means retail outlets that furnish primarily pet and companion animal products including, but not limited to, independent pet stores and pet superstores, but excluding non-pet stores such as Wal-Mart, K-Mart, Costco and grocery stores.

(q) "3G Product Year" means the 12-month period commencing on the first day of the calendar month following the calendar month in which the first commercial sale of the 3G Product occurs and the 12-month period commencing on such anniversary of such date.

(r) "Patent Claim" shall have the meaning ascribed to such term in Section 8(d)(i).

(s) "New Product" shall have the meaning ascribed to such term in Section 13.

2. Appointment; Payments.

(a) On and subject to the terms and conditions of this Agreement, BRP hereby grants to VBAC, and VBAC hereby accepts, the exclusive rights to manufacture, have manufactured, market, sell and have sold the Products in the Ethical Market in the Territory. Subject to Section 4(f) VBAC may appoint agents or subdistributors hereunder.

(b) In consideration for the rights granted by BRP to VBAC under Section 2(a), VBAC shall make the following cash payments to BRP:

(i) $2,000,000.00 (Two Million Dollars) acquisition fee, of which $1,000,000.00 (One Million Dollars) shall be paid upon the execution of this Agreement and the second $1,000,000.00 (One Million Dollars) shall be paid on July 1, 2000;

(ii) $750,000.00 (Seven Hundred and Fifty Thousand Dollars) shall be paid within five days after receipt by BRP of a Registration for the 2G Product from FDA/CVM provided said Registration occurs on or before January 1, 2001. If BRP receives a Registration for the 2G Product on or after January 2, 2001 but not later than June 1, 2001, the cash payment will be $375,000.00 (Three Hundred Seventy Five Thousand Dollars). If BRP receives a Registration for the 2G Product after June 1, 2001 there will be no cash payment due BRP under this Section 2(b)(ii);

(iii) $700,000.00 (Seven Hundred Thousand Dollars) shall be paid within five days after the submission of the 3G Product package to the FDA/CVM provided this submission occurs on or before September 1, 2000; provided, however, that if the submission is delayed as a result of the transfer of the manufacturing package from BRP's current manufacturer to PM Resources, Inc. and if all other components of the package are complete and ready for submission, then the September 1, 2000 date, and all other dates described in this Section 2(b)(iii) and in Section 2(b)(iv), shall be extended by the number of days of delay resulting from such transfer. In the event BRP fails to submit the package by September 1, 2000, the acquisition fee payable under this Section 2(b)(iii) will be reduced to $350,000.00 (Three Hundred and Fifty Thousand Dollars) provided submission occurs on or prior to March 1, 2001.

31

In the event submission does not occur until after March 3, 2001, no acquisition fee will be payable to BRP under this Section 2(b)(iii);

     (iv)  $700,000.00 (Seven Hundred Thousand Dollars) shall be paid within five days after receipt by BRP of a Registration for the 3G Product from FDA/CVM, provided said registration occurs on or before January 1, 2002. If BRP receives a Registration for the 3G Product on or after January 2, 2002 but no later than June 1, 2002, the cash payment under this Section 2(b)(iv) shall be $350,000.00 (Three Hundred and Fifty Thousand Dollars). If BRP receives a Registration for the 3G Product after June 1, 2002 there will be no cash payment due BRP under this Section 2(b)(iv);

     (v)  $100,000.00 (One hundred Thousand Dollars) shall be paid upon approval of the Flavored Pyrantel Product, but only if BRP shall have granted VBAC the non-exclusive right to sell that product in the Farm and Fleet Sector and the Pet Specialty Channel in the Territory;

     (vi)  Subject to Section 2(b)(viii) below, VBAC shall pay BRP 4% royalties on Net Sales of the 1G Product. 1G royalties will be reduced to 2% of Net Sales upon the approval and commercial availability of the 2G Product. Further, in the event there are more than two generic competitors of the 1G Product in the Territory, each of which shall be sold under separate ANADA's, the royalties being paid at the time on the 1G Product shall be reduced by 50%;

     (vii)  Subject to Section 2(b)(viii) below, VBAC shall pay BRP 4% royalties on Net Sales of the 2G Product provided the Product receives FDA/CVM approval on or before January 1, 2001; 2% royalties if approval is secured on or after January 2, 2001 but no later than June 1, 2001; 1% royalties if approval is secured after June 1, 2001. Further, in the event there are more than two generic competitors of the 2G Product in the Territory, each of which shall be sold under separate NADA's, the royalties being paid at the time on the 3G Product will be reduced by 50%;

     (viii)  Upon approval and commercial availability of the 3G Product, the royalties being paid at the time on the 1G and 2G Product shall be reduced by 50%; VBAC shall pay BRP an 8% royalty on the first $10,000,000.00 (Ten Million Dollars) of 3G Product Net Sales during each 3G Product Year; a 12% royalty on the second $10,000,000.00 (Ten Million Dollars) of 3G Product Net Sales during each 3G Product Year and 15% royalties on all 3G Product Net Sales in excess of $20,000,000.00 (Twenty Million Dollars) during each 3G Product Year. Further, in the event there are more than two generic competitors of the 2G Product in the Territory, each of which shall be sold under separate NADA's, the royalties being paid at the time on the 3G Product will be reduced by 30%.

     (ix)  If BRP has not received a Registration from FDA/CVM by June 1, 2002 with respect to the 2G Product or June 1, 2003 with respect to the 3G Product, BRP shall transfer ownership of and all rights in all data with respect to such Product to VBAC.

   3.  Term.

     This Agreement shall become effective on the date hereof and shall remain in effect for the duration of the Term, unless sooner terminated in accordance with Section 13 below.

4. Duties of VBAC.

(a) Sales. VBAC undertakes to use commercially reasonable efforts to create a market for, promote, supply the demand for and obtain maximum sales of the Products throughout all areas of the Territory. Such efforts shall include, but not be limited to, advertising, exhibitions, distribution of samples and technical sales materials, and demonstrations. In determining the commercial reasonableness of VBAC's efforts, it shall be assumed that neither VBAC nor any of its Affiliates market or sell any products that compete with the Products in the Territory.

(b) Promotional Materials and Packaging. Subject to Section 11, VBAC shall, at its own cost and expense, produce all promotional literature, advertisements and other promotional materials to be used in connection with the marketing and sale of the Products and will promptly supply copies of such materials to BRP. VBAC shall also, at its own expense, develop and bear the cost of all packaged good artwork, packaging, labeling, and other associated costs.

(c) Manufacturing. VBAC shall be responsible for selecting and securing supply from one or more FDA-approved manufacturers to manufacture Products for VBAC. BRP shall introduce VBAC to manufacturers who have produced bio-batches for BRP, but VBAC shall be responsible for entering into contracts directly with manufacturers. All Products shall be manufactured in accordance with cGMP and applicable Registrations.

(d) Analytical Testing and Stability. BRP shall be responsible for the expense of all analytical testing and stability work associated with the Products prior to FDA/CVM approval. VBAC shall be responsible for all analytical testing and stability work associated with the Products once approved by the FDA/CVM. All analytical testing and stability work on the Products shall be in accordance with the applicable regulatory requirements.

(e) Reports and Payments. VBAC shall deliver to BRP within 45 days after the end of each calendar quarter a written report showing its computation of Net Sales for such quarter and royalties due under Section 2(b) of this Agreement for such calendar quarter. Simultaneously with the delivery of each such report, VBAC shall tender payment of all amounts shown to be due thereon. All amounts due under this Agreement shall be paid to BRP in United States dollars (U.S. $) by check, or in such other form and/or manner as BRP may reasonably request. During the term of this Agreement, BRP shall have the right from time to time (not to exceed twice during each calendar year) to inspect, or have an agent, accountant or other representative inspect, during normal business hours, and upon reasonable advance notice (not less than one week), such books, records and other supporting data of VBAC as may be necessary to verify VBAC's computation of royalties due under this Agreement. In the event that an examination by BRP of VBAC's books and records reveals an underpayment by VBAC, VBAC shall immediately pay BRP the deficiency plus interest at an annual rate equal to the Prime Rate (as reported in The Wall Street Journal on the date payment was due) plus 2%. In the event such examination reveals an overpayment by VBAC, BRP shall immediately pay VBAC the amount of such overpayment plus interest from the date of overpayment at an annual rate equal to the Prime Rate plus 2%. In the event that any underpayment amounts to more than five percent of the amount due for the period examined, VBAC shall also reimburse BRP for the cost and expense of the examination.

(f) Subdistributors. VBAC may appoint agents or subdistributors to sell Products. Any agreement between VBAC and an agent or subdistributor shall be consistent with the terms of this Agreement and shall not serve to reduce the obligations of VBAC to BRP hereunder. VBAC shall be responsible for enforcing the provision of its agreements with agents or subdistributors and shall indemnify and hold BRP harmless for any expenses, damages, costs, or losses arising out of any acts or omissions by any agents or subdistributors.

5. Regulatory Matters.

(a) Ownership of Registrations. BRP shall own all Registrations obtained at its expense. VBAC shall own all Registrations obtained at its expense; provided, however, that upon expiration or termination of the Term with respect to any Product, upon request by BRP, VBAC shall transfer any Registration applicable to such Product to BRP upon BRP's reimbursement of VBAC for (i) all out-of-pocket expenses and (ii) VBAC employee time at a rate of $225,000 per full time equivalent, in each case incurred by VBAC in obtaining such Registration.

(b) Responsibility for Regulatory Matters.

(i)     BRP shall use commercially reasonable efforts, at its expense, to register the Products in the United States. VBAC shall be responsible, at its expense, for obtaining Registrations for the Products in countries other than the U.S. in which VBAC desires to sell Products. BRP shall provide reasonable assistance to VBAC in obtaining such Registrations, including by providing VBAC with applicable Know-How; provided, however, that VBAC shall reimburse BRP for all out-of-pocket expenses incurred by BRP in providing such support and shall compensate BRP at a rate of $225,000 per full time equivalent for hours of support provided by BRP in excess of ten hours per month. Each party shall keep the other informed as to the status of Registrations and shall promptly provide the other with a copy of any communication from FDA/CVM or any other Regulatory Agency. Each party shall provide the other party with a reasonable opportunity (but no more than 15 business days) to review and comment upon any proposed material submission to any Regulatory Agency, provided that the party responsible for obtaining the applicable Registration shall have sole discretion over the final contents of any such submission. Each party shall provide the other party, at the other party's expense, with a copy of any submission to any Regulatory Agency.

(ii)    VBAC, together with any manufacturer of Products for VBAC, shall be responsible for dealing with FDA/CVM and other Regulatory Agencies with respect to all matters relating to manufacturing compliance and quality assurance, packaging and labeling, promotional compliance, and medical issues. With respect to such matters, VBAC shall promptly and fully respond to any communication from any Regulatory Agency and shall file any reports required by such Regulatory Agency. Each party shall cooperate with the other in responding to any issue raised by FDA/CVM or any other Regulatory Agency.

(c) Adverse Experiences. The parties shall advise each other in a timely manner of any information of which they have knowledge concerning any adverse experience in connection with the use of the Products, including the incidence or severity thereof, associated with non-clinical or clinical use, studies, investigations or tests, whether or not determined to be attributable to the Products. Reports of serious adverse experiences shall be made available to

the other party within five (5) working days after a party becomes aware of any such adverse experience. Upon receipt of any such information concerning any serious adverse experience by either party, the parties shall promptly consult each other and use commercially reasonable efforts to agree upon appropriate actions. BRP shall make such reports of adverse experiences as shall be required by FDA/CVM and VBAC shall make such reports of adverse experiences as shall be required by any Regulatory Agency outside of the United States.

(d) Recalls of Products. VBAC shall recall any Product if required by any Regulatory Agency or if otherwise reasonably required due to adverse experiences, manufacturing problems or similar matters. Subject to VBAC's obligation to reimburse BRP as provided in Section 5(b)(i) hereof, BRP shall reasonably cooperate with VBAC in connection with any recall. VBAC shall bear the costs and expenses of any recall of Products.

6.   Representations and Warranties.

(a) By BRP. BRP hereby represents and warrants to VBAC that:

(i)   it is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware;

(ii)   it has all necessary corporate power and authority to enter into this Agreement, grant to VBAC all of the rights granted hereby and to perform its obligations hereunder;

(iii)   this Agreement is the valid, legal and binding obligation of BRP, enforceable against it in accordance with its terms, except where enforceability may be limited by bankruptcy, insolvency or similar laws affecting creditors' rights or by principles of equity;

(iv)   the execution, delivery and performance by it of this Agreement do not conflict with or result in a breach of, any agreement, written or oral, to which it is a party or by which it or its property is bound; and

(v)   BRP has consulted with patent counsel regarding the freedom from infringement of the formulations of each of the Products and, to the best of BRP's knowledge, such formulations do not infringe any valid U. S. patent.

(b) By VBAC. VBAC hereby represents and warrants that:

(i)   it is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware;

(ii)   it has all necessary corporate power and authority to enter into this Agreement, and perform its obligations hereunder;

(iii)   this Agreement is the valid, legal and binding obligation of VBAC, enforceable against it in accordance with its terms, except where enforceability may be limited by bankruptcy, insolvency or similar laws affecting creditors' rights or by principles of equity;

(iv) the execution, delivery and performance by VBAC of this Agreement do not conflict with, or result in a breach of any agreement, written or oral, to which it is a party or by which it or its properties is bound; and

(v) it, and its sublicensees, subcontractors, subdistributors, manufacturers, agents and Affiliates shall comply with all laws, rules and regulations applicable to the manufacture, marketing or sale of Products, including, without limitation, the FDC Act and cGMP.

7. Intellectual Property Matters.

(a) Rights of BRP in Know-How. BRP shall be the sole and exclusive owner of the Know-How. BRP shall have the exclusive, worldwide right, exercisable in its sole discretion and at its sole expense, to file, prosecute, defend and maintain patents and patent applications with respect to the Know-How (collectively, "BRP Patent Rights"). BRP hereby grants to VBAC an exclusive, worldwide, royalty-free license under the Know-How and the BRP Patent Rights, exercisable during the Term, to make, have made, use, sell and have sold Products in the Territory. VBAC shall have the right to grant sublicenses of equal or lesser scope under such license only to the extent necessary to allow third parties to manufacture or sell Products for or on behalf of VBAC. VBAC shall have no rights under the BRP Patent Rights or the Know-How with respect to products other than the Products.

(b) VBAC Improvements. VBAC shall be the sole and exclusive owner of all improvements to the Know-How and the BRP Patent Rights developed by VBAC (the "VBAC Improvements"), and shall have the exclusive, worldwide right, exercisable in its sole discretion and at its sole expense, to prosecute, defend and maintain patents and patent applications with respect to the VBAC Improvements (collectively the "VBAC Patent Rights"). VBAC hereby grants to BRP an exclusive, worldwide, royalty-free license under the VBAC Improvements and the VBAC Patent Rights, exercisable during the Term, to make, have made, use, sell and have sold Products outside the Territory. BRP shall have the right to grant sublicenses of equal or lesser scope under such license only to the extent necessary to allow third parties to manufacture or sell such Products for or on behalf of BRP. BRP shall have no rights under the VBAC Improvements or VBAC Patent Rights in the Territory or with respect to products other than the Products.

(c) BRP Improvements. BRP shall be the sole and exclusive owner of all improvements to the Know-How and the BRP Patent Rights developed by it (the "BRP Improvements"), and shall have the exclusive, worldwide right, exercisable in its sole discretion and at its sole expense, to prosecute, defend and maintain patents and patent applications with respect to the BRP Improvements (collectively the "BRP Improvement Patent Rights"). BRP hereby grants to VBAC an exclusive, worldwide, royalty-free license under the BRP Improvements and the BRP Improvement Patent Rights, exercisable during the Term, to make, have made, use, sell and have sold the Products in the Territory. VBAC shall have the right to grant sublicenses of equal or lesser scope under such license only to the extent necessary to allow third parties to manufacture or sell such Products for or on behalf of VBAC. VBAC shall have no rights under the BRP Improvements or BRP Improvement Patent Rights with respect to products other than the Products.

8. Indemnification.

(a) By VBAC. VBAC shall defend and indemnify BRP from and against all damages, liabilities, costs and expenses (including reasonable legal fees and costs) arising out of:

(i) any breach of this Agreement by VBAC;

(ii) any negligent act or omission by it or its subcontractors, subdistributors, agents, sublicensees or Affiliates or any willful misconduct by it or its subcontractors, subdistributors, agents, sublicensees or Affiliates; or

(iii) subject to Section 8(d) below, any claim relating to the manufacture, marketing, use or sale of Products, including any claim that any Product infringes a patent, copyright or trade secret of a third-party, and any claim for injuries or death to persons or animals or damage to or destruction of tangible property;

provided, however, that VBAC shall have no liability or obligation hereunder with respect to any claim to the extent such claim results from any breach of this Agreement by BRP or its Affiliates, any negligent act or omission or any willful misconduct of BRP or its Affiliates, or any claim that the formulation of a Product infringes any patent or constitutes misappropriation of any trade secret or proprietary information of any third party.

(b) By BRP. BRP shall defend and indemnify VBAC from and against all damages, liabilities, costs and expenses (including reasonable legal fees and costs) arising out of any claim resulting from:

(i) any breach of this Agreement by BRP;

(ii) any negligent act or omission by BRP or its Affiliates or any willful misconduct by BRP or its Affiliates; or

(iii) subject to Section 8(d) below, any claim that the formulation of a Product infringes any patent or constitutes misappropriation of any trade secret or proprietary information of any third party;

provided, however, that BRP shall have no liability or obligation hereunder with respect to any claim to the extent such claim results from any breach of this Agreement by VBAC or any negligent act or omission or any willful misconduct by VBAC or its subcontractors, subdistributors, agents, sublicensees or Affiliates.

(c) Party Seeking Indemnification. If either party seeks defense or indemnification under the terms of this Section 8, it shall inform the other party of the claim as soon as reasonably practicable after it receives notice thereof, shall permit the other party, at that party's cost, to assume direction and control of the defense of the claim, and shall cooperate as requested (at the expense of the other party), in the defense of the claim. The defending or indemnifying party shall not settle or otherwise compromise any claim or suit without the prior written consent of the indemnified party.

(d) Limitations on Patent Indemnity.

(i)    Upon assertion of a claim in writing by any third party to BRP or VBAC, within six months following the first commercial sale of a Product, that the formulation of such Product infringes any patent right of any third party (a "Patent Claim"), the party to which such assertion is made shall notify the other party within two business days. Within five business days following such notice, BRP and VBAC shall engage mutually acceptable patent counsel, who shall not be regular patent counsel to either party or its Affiliates. Such counsel shall be asked to advise whether such counsel believes that the formulation of the relevant Product more likely than not infringes the relevant claim(s) of the relevant patent(s), either literally or under the Doctrine of Equivalents, and whether the relevant claim(s) of the relevant patent(s) are more likely than not to be valid. BRP shall bear all costs of such counsel.

(ii)    If the advice of such counsel is that the Product is more likely than not to infringe one or more claim(s) of the relevant patent(s), either literally or under the Doctrine of Equivalents, and that such claim(s) are more likely than not to be valid, then either,

(A)    VBAC may elect, upon notice given to BRP within five business days following receipt of such advice, to discontinue making, marketing and selling the Product, in which event BRP shall pay VBAC (1) $500,000 if the Patent Claim relates to the 1G Product, $500,000 if the Patent Claim relates to the 3G Product, or $750,000 if the Patent Claim relates to the 2G Product and (2) 62.5% of the amount paid by VBAC to BRP under Section 2(b)(ii), if the Patent Claim relates to the 2G Product, or 62.5% of the amount paid by VBAC to BRP under Sections 2(b)(iii) and 2(b)(iv), if the Patent Claim relates to the 3G Product; and VBAC shall have no further rights under this Agreement with respect to such Product, except that BRP shall defend VBAC with respect to such Patent Claim but shall have no obligation to indemnify VBAC for any damages, liabilities, costs or expenses arising out of such Patent Claim; or

(B)    VBAC may continue making, marketing and/or selling the Product, in which event BRP shall have no further obligation to defend or indemnify VBAC with respect to such Patent Claim and VBAC shall defend and indemnify BRP with respect to such Patent Claim pursuant to Section 8(a)(iii); or

(C)    Notwithstanding any notice by VBAC to BRP under Section 8(d)(ii)(a) above, BRP may direct VBAC, within five business days after receipt of such notice, to continue making, marketing and/or selling the Product, in which case BRP shall defend and indemnify VBAC with respect to such Patent Claim pursuant to Section 8(b)(iii) hereof.

(iii)    If the advice of such counsel is that either (A) the Product is less likely than not to infringe, either literally or under the Doctrine of Equivalents, at least one of the relevant claim(s) of the relevant patent(s) or (B) each of the relevant claim(s) of the relevant patent(s) is less likely than not to be valid, then VBAC shall proceed with the marketing and sale of the Product hereunder, VBAC shall have no obligation to defend or indemnify BRP with respect to such Patent Claim and BRP shall defend VBAC with respect to such Patent Claim but shall have no obligation to indemnify VBAC for any damages, liabilities, costs or expenses arising out of such Patent Claim.

(iv)    BRP shall have no obligation to defend or indemnify VBAC under Section 8(b)(iii) with respect to any patent infringement claim relating to a Product that is asserted more than six months following the first commercial sale of such Product.

9. <u>Insurance</u>. VBAC shall maintain during the Term and for a period of at least three years thereafter, insurance against such risks and in such amounts as is customary for companies engaged in the manufacture and sale of pharmaceutical products.

10. <u>Proprietary Information</u>.

(a) <u>Non-Disclosure</u>. No proprietary information disclosed by either party to the other in connection with this Agreement, including without limitation, the Know-How, shall be disclosed to any person or entity other than the recipient party's employees and contractors directly involved with the recipient party's use of such information who are bound by written agreements to protect the confidentiality of such information. Such information shall be used only for the purposes contemplated by this Agreement, and such information shall otherwise be protected by the recipient party from disclosure to others with the same degree of care accorded to its own proprietary information, but not less than a reasonable degree of care. To be subject to this provision, information must be delivered in writing and designated as "proprietary" or "confidential" or, if initially disclosed orally or visually, such information must be declared as "proprietary" or "confidential" at the time of such disclosure and must be confirmed in writing as "proprietary" or "confidential" within thirty (30) days after the disclosure in order for such information to be treated as "proprietary" or "confidential" under this Section 10; provided, however, that the contents of any applications for Registrations are hereby designated as proprietary and confidential. Information will not be subject to this Section if it:

(i)   is or becomes a matter of public knowledge without the fault of the recipient party;

(ii)   was known to the recipient party prior to the disclosure to it by the other party, as evidenced by written records of the recipient party;

(iii)   was received by the recipient party without obligation of confidentiality from a third party having the legal right to disclose it to the recipient party;

(iv)   was independently developed by the recipient party, as evidenced by written records of the recipient party;

(v)   is required to be disclosed under operation of law or;

(vi)   was disclosed by the recipient party with the disclosing party's prior written consent.

In the event that the recipient party is obligated to disclose proprietary or confidential information under operation of law, the recipient party shall promptly notify the disclosing party and will cooperate with the disclosing party to obtain a protective order or otherwise minimize the scope of the disclosure.

(b) <u>Termination</u>. Upon: (i) termination of this Agreement or (ii) written request of the party properly disclosing the "proprietary" or "confidential" information under this Section 10, the recipient of such information shall promptly deliver to the other all tangible manifestations of proprietary information of the other party in the possession or control of such

party, and all copies thereof. The obligations under this Section 10 shall survive the termination of this Agreement for a period of five (5) years.

11.    Trademarks.

(a) License. Subject to the terms and conditions specified in this Agreement, BRP hereby grants to VBAC and VBAC accepts an exclusive, nonassignable right and license to use the trademark IVERHART (the "Trademark"), which is the subject of a United States trademark application (Serial No. 75/321,729), during the Term in the Territory solely in connection with the manufacture, sale and distribution of the Products.

(b) Quality Control. If VBAC sells Products under the Trademark, BRP shall have the ability to verify that the Products meet the standards of quality established by BRP for products sold or to be sold under the Trademark. VBAC's form and style of display and use of the Trademark in any packaging, labeling or advertising or in any other written materials intended for public dissemination shall be subject to BRP's prior written approval. BRP shall be deemed to have approved VBAC's form and style of display and use of the Trademark if BRP has not responded in writing to any written request for approval by VBAC within ten (10) business days following BRP's receipt of such request. VBAC shall submit any requests for approval pursuant to this Section 11 to such person as may be designated by BRP in writing.

(c) Ownership. BRP expressly reserves the sole and exclusive ownership of the Trademark and all rights relating thereto. VBAC hereby acknowledges that BRP is the sole owner of the Trademark and agrees not to challenge at any time, directly or indirectly, the rights of BRP thereto or the validity or the distinctiveness thereof. Use of the Trademark by VBAC under this Agreement shall inure to the benefit of BRP. VBAC shall use its best efforts not to do or permit to be done any act calculated or likely to prejudice, affect, impair or destroy the title and interest of BRP in and to the Trademark.

(d) Maintenance and Protection of Trademark. VBAC agrees to assist BRP, at BRP's request and expense, in the procurement and maintenance of BRP's rights in the Trademark and without limitation, in connection therewith, VBAC agrees to execute and deliver to BRP in such form as may reasonably be requested all instruments necessary to effectuate trademark protection for BRP or to record VBAC as a registered user of the Trademark or, upon expiration or termination of this Agreement, to assign or cancel such registration and VBAC hereby appoints BRP its attorney-in-fact to execute such instruments on VBAC's behalf if VBAC fails to do so. The power granted BRP in the preceding sentence is acknowledged by VBAC to be coupled with an interest and shall be irrevocable. BRP makes no warranty or representation that any trademark protection has been or will be secured.

(e) VBAC Trademarks. BRP shall neither acquire, nor claim any right, title or interest in or to any of VBAC's trademarks by virtue of this Agreement.

12. Competitive Products. During the Term, neither VBAC or its Affiliates nor BRP or its Affiliates shall, directly or indirectly, develop, manufacture, market or sell, or assist any third party in developing, manufacturing, marketing or selling, any Competitive Products in the United States or Canada. The foregoing shall not, however, restrict VBAC or its Affiliates from contract manufacturing Competitive Products that are marketed and sold by parties other than VBAC or its Affiliates. The parties agree that the restrictions contained in this Section 12 are reasonable

for the purpose of preserving the exclusive rights granted to VBAC hereunder and for maximizing the sale of Products hereunder.

13. <u>Right of First Offer</u>. In the event that BRP proposes to sell or license its rights, in the canine and feline fields, anywhere in the world with respect to any other product developed by BRP that contains ivermectin, praziquantel or pyrantel pamoate, alone or in combination with other parasiticides (each, a "New Product"), BRP shall provide VBAC with a reasonably detailed written description of such New Product. For a period of 60 days after its receipt of such description, VBAC shall have the exclusive right to negotiate the acquisition or license of such New Product in the canine and feline fields in the applicable territory and the parties shall negotiate in good faith during such period. At the conclusion of the 60-day period, if an agreement relating to the New Product has not been entered into by BRP and VBAC, the parties may continue to negotiate on such basis as shall be mutually agreeable or either party, at its sole discretion, may discontinue negotiations. If either party elects to discontinue negotiations, BRP shall be free to negotiate and conclude a transaction with any third party with respect to such New Product, provided that BRP may not, during the 12-month period following the end of such 60-day period, conclude such transaction on terms as or less favorable to BRP than the last terms offered by VBAC.

14. <u>Default and Termination</u>.

(a) <u>Events of Default</u>. Without prejudice to any remedy that either party may have against the other for breach or non-performance of this Agreement, either party may terminate this Agreement:

(i)    for "cause", (A) if the other party shall breach any material provision of this Agreement, and such breach is not cured within thirty (30) days after notice thereof from the other party or (B) immediately if the other party shall have breached a payment provision on three or more occasions; or

(ii)    in the event of (A) a dissolution, termination of existence, liquidation, insolvency or business failure of the other party, or the appointment of a custodian or receiver of any part of such party's property, if such appointment is not terminated or dismissed within thirty (30) days; (B) a composition or an assignment or trust mortgage for the benefit of creditors by the other party; or (C) the commencement with respect to the other party of any proceeding under any federal or state bankruptcy, reorganization, receivership, insolvency or other similar law affecting the rights of creditors generally, which proceeding, if initiated against such party, is not dismissed within thirty (30) days.

(b) <u>Effects of Termination</u>. Upon any termination of this Agreement:

(i)    each party shall immediately deliver to the other party all books, records, notes, files, data and documents containing any proprietary or confidential information of the other party;

(ii)    neither party shall be relieved from any of its obligations incurred prior to the effectiveness of termination;

(iii)  if this Agreement is terminated by BRP pursuant to Section 13(a)(i), which for the avoidance of doubt shall include any such termination resulting from a breach by VBAC of Section 12, VBAC shall pay BRP the amounts described in Sections 2(b) (ii), (iii) and (iv), regardless of whether the events specified therein shall have occurred; and

(iv)  the obligations of the parties under Sections 6, 7, 8, 10, 15 and 16 shall survive the termination of this Agreement.

15. <u>Governing Law; Jurisdiction</u>. This Agreement shall be governed by and construed under the laws of North Carolina, as if made and to be fully performed in such jurisdiction. All issues and questions concerning the construction, validity, enforcement, and interpretation of this Agreement and any Appendices, Schedules or Exhibits attached hereto shall be governed by and construed in accordance with the laws of North Carolina, without giving effect to any choice of law or conflict of law rules or provisions (whether of North Carolina, or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than North Carolina.

16. <u>General Provisions</u>.

(a) <u>Assignment</u>.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by either party hereto without the prior written consent of the other party and any attempt to do so will be void. Notwithstanding the foregoing, either party may assign any of its rights or obligations to any Affiliate of such party, provided that the assigning party shall continue to be primarily liable for all of its obligations hereunder.

(b) <u>Force Majeure</u>.  In the event that either party is prevented from performing, or is unable to perform, any of its obligations under this Agreement due to any act of God, fire, casualty, flood, war, strike, lock out, failure of public utilities, epidemic, destruction of production facilities, insurrection, shortage of materials, labor, equipment, transportation or energy, or any other cause beyond the reasonable control of the party invoking this provision, and if such party shall have used its best efforts to avoid such occurrence and minimize its duration and has given prompt written notice to the other party, then the affected party's performance shall be excused and the time for performance shall be extended for the period of delay or inability to perform due to such occurrence.

(c) <u>Publicity</u>.  Neither party shall, without the prior written consent of the other, disclose the specific terms and conditions of this Agreement, except as may be required by applicable securities or other laws.

(d) <u>Waiver</u>.  The waiver by either party of a breach or a default of any provision of this Agreement by the other party shall not be construed as a waiver of any succeeding breach or default of the same or any other provision, nor shall any delay or omission on the part of either party to exercise or avail itself of any right, power or privilege that it has or may have hereunder operated as a waiver of any right, power or privilege by such party.

(e) <u>Relationship of Parties</u>.  Nothing contained in this Agreement shall be deemed to constitute either party as the agent or representative of the other party, or both parties as joint venturers or partners for any purpose. Neither party shall be responsible for the acts or omissions of the other party, and neither party will have the authority to speak for, represent or obligate the other party in any way without prior written authority from the other party.

(f) Survival of Obligations. All obligations of either party which, by their nature, require performance after the expiration or termination of this Agreement, shall survive the expiration or termination of this Agreement and continue to be enforceable.

(g) Severability. The parties hereto agree that the terms and provisions in this Agreement are reasonable and that the terms and provisions of this Agreement shall be enforced to the fullest extent permissible under law. In the event that any term or provision of this Agreement is held to be unenforceable because it is invalid or in conflict with any law of any relevant jurisdiction, then such unenforceable or invalid term or provision shall not affect the enforceability or validity of the remaining terms and provisions of this Agreement, and the parties hereto hereby agree to replace such unenforceable or invalid term or provision with an enforceable and valid arrangement which, in its economic effect, shall be as close as possible to the unenforceable or invalid term or provision.

(h) Notices. All notices, requests and other communications made hereunder shall be in writing and shall be deemed duly given upon receipt if delivered personally, sent by registered or certified mail, return receipt requested postage prepaid, sent via nationally recognized overnight carrier or sent via facsimile (upon confirmation of delivery thereof), as follows, or to such other address or person as either party may designate by notice to the other party hereunder.

If to VBAC or VBSA:

Virbac Corporation
3200 Meacham Boulevard
Fort Worth, Texas 76137
Facimile No: (817) 831-8362
Attn: Thomas L. Bell, President and Chief Executive Officer

If to BRP or IDEXX:

Blue Ridge Pharmaceuticals, Inc.
4249 Piedmont Parkway, Ste. 105
Greensboro, NC 27410
Facsimile No.: (336) 852-3540
Attn: Roland H. Johnson, President

With copy to:

IDEXX Laboratories, Inc.
One IDEXX Drive
Westbrook, ME 04092
Facsimile No: (207) 856-0347
Attn: General Counsel

(i) <u>Compliance with Laws</u>.  Each party to this Agreement shall comply with all applicable laws and regulations relating to the Products, their manufacture and sale, and their respective performance under this Agreement.

(j) <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties with reference to the subject matter hereof.  No waiver, consent, modification or change of the terms of this Agreement shall bind either party unless in writing signed by both parties by their duly authorized representatives.  There are no understandings, agreements, representations or warranties, express or implied, with respect to the subject matter hereof except as expressly set forth in this Agreement.

(k) <u>Headings</u>.  The headings contained in this Agreement are for convenience of reference only and shall not be considered in interpreting or construing this Agreement.

(l) <u>Successor and Assigns</u>.  This Agreement shall be binding and inure to the benefit of the parties hereto and their permitted successors and assigns.  No other person shall be entitled to rely upon this Agreement or be entitled to any benefits hereunder except as expressly provided for herein.

(m) <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

17. <u>Guarantees</u>.  IDEXX hereby unconditionally guarantees the performance by BRP of all of its obligations hereunder.  VBSA hereby unconditionally guarantees the performance by VBAC of all of its obligations hereunder.  VBSA shall be relieved of its guaranty hereunder upon its presentation to BRP of a performance bond securing the performance by VBAC of its obligations hereunder, which bond shall be in a form reasonably acceptable to BRP.

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

BLUE RIDGE PHARMACEUTICALS, INC.

By: _Stephen A. Capps_
    Name: Stephen A. Capps
    Title: Vice President

VIRBAC CORPORATION

By: _Thomas L Bell_
    Name: Thomas. L. Bell
    Title: President · C.E.O.

IDEXX LABORATORIES, INC.

By: _____
    Name:
    Title:

VIRBAC S.A.

By: _____
    Name:
    Title: